EMIL BOECK, Appellant, v. WM. MILKE ET AL.

**Evidence:** COMMUNICATION WITH A DECEDENT.   In seeking to estab-
1   lish title to a decedent's land under an oral contract, the party
    claiming the benefit of the contract is disqualified from testifying
    to personal communications made to him by decedent; but the
    stepfather of plaintiff is held, on rehearing, competent to testify
    that decedent promised him to give plaintiff the land on certain
    conditions.

**Real property:** ORAL CONTRACT TO CONVEY: EVIDENCE.   To justify
2   a decree settling the title to real property in pursuance of an oral
    promise the evidence must be clear, definite and conclusive: and
    this is especially true where the circumstance of taking possession
    and making improvements is lacking.

**Same:** DECLARATIONS OF A DECEDENT.   Conceding that declarations of a
3   decedent may be shown in aid of an oral promise to give an-
    other his land, still where the same are chiefly as to such an in-
    tention merely they are not very material evidence of a definite
    and specific contract to do so, and when made many years pre-
    viously are of little weight.

**Oral contract to convey land:** EVIDENCE.   Evidence reviewed and
4   held insufficient to establish a claimed oral contract of decedent to
    give plaintiff his land in consideration that he live with decedent
    the remainder of his life.

*Appeal from Chickasaw District Court.*—HON. A. N. HOBSON, Judge.

TUESDAY, DECEMBER 15, 1908.

SUPPLEMENTAL OPINION THURSDAY, MARCH 18, 1909.

ACTION in equity to establish plaintiff's title to a certain tract of land, under an oral contract with John Milke, deceased, as against the defendants, who are alleged to claim some interest in the property described, as heirs of said John Milke. There was a decree for the defendants, and plaintiff appeals.—*Affirmed.*

*R. Feyerbend* and *Springer, Clary & Condon,* for appellant.

*Smith & O'Connor,* for appellees.

McCLAIN, J.—Plaintiff claims title to a certain described eighty-acre tract of land, under an oral contract with John Milke, deceased, whose heirs are defendants in the action, alleged to have been made in 1887 by one Michael Ross, plaintiff's stepfather, when plaintiff was about thirteen years of age, by which said Milke agreed that, if plaintiff would live with him as a member of his household and family, and obey and take care of him in his declining years, plaintiff should have whatever real estate and other property said Milke might own at the time of his death. Said Milke died intestate in December, 1906, in possession of and holding the legal title to the eighty-acre tract of land in controversy. The evidence introduced in behalf of plaintiff tends to show that plaintiff came to this country in 1886, and lived in the family of his mother and stepfather, on a farm near that of said Milke, until April, 1887, when, after having attended a Lutheran school for some months, he was confirmed as a member of that church, and that in the meantime he had, for some indefinite period, been employed by said Milke and, further, that soon after his confirmation said Milke visited the home of plaintiff's mother and stepfather, and in plaintiff's presence made some arrangement with them by which plaintiff was to live with said Milke. As plain-

tiff's entire right of action depends on the terms of this alleged arrangement, which is directly testified to by the plaintiff, his mother, and his stepfather, we shall set out briefly the evidence appearing in the record as to what such arrangement was. The stepfather testified that John Milke, whom he had known as a little boy in the old country, and who had come to this country in 1884, said to witness that he (Milke) "got nobody around there. He was alone there. Why can't I let him have Emil"; and that he replied he had work enough for him, when Milke responded that "he liked that boy. He like to have him right along." And the witness further testified that Milke asked him to change Emil's name, which he refused to do; that a week or two later Milke came back, and asked "if he can get Emil. I said, 'No, I had plenty of work at home for him.' Then he says, 'Let me have that boy; I like him.' Then I asked my wife if she would let him go. She says, 'Yes, he can take him along.' Then John says, 'You never get him back more.' " In answer to a question as to what, if anything, Milke said he would do for Emil if the witness would let him go, the witness answered: "John promised me for Emil the property, all that he got there after his death. After John goes dead, Emil should have whole property. That is all." In response to a question as to what, if anything, Milke said as to what he wanted Emil to do, the witness replied: "Emil should do every kind of work he could do. He likes him all right; say he good boy." Witness also testified that Milke, in connection with this arrangement, gave him $50, which is all the money or anything else he got from Milke, or any one else, for Emil. The mother, Conradine Ross, testified that three or four weeks after Emil came to America, he went to live with Milke, and remained with him that summer, and also on Saturdays and Sundays during the winter, while he was attending the Lutheran school; that she heard the conversation between her husband and

Milke in regard to the latter taking Emil, and that the latter said: "Now I like this boy; let me have him. I haven't any children, and if he stays with me, I will leave him this property. Then I will hold him as my son"; that then her husband said to her, "Let him go if he will give him the property as he said he would"; and that Milke then took Emil and said, "Now you will not get him back again." Witness further testified that Milke said in this conversation, "If he will be obedient and mind me, and do what I want him to do, then when I die I will give him my property. Then I will hold him as my son"; and that her husband then said, "If you will do this, it will be all right, you can take him with you." The plaintiff testified that about Easter, 1886, which he afterwards changed to 1887, he heard a talk between Milke and his father concerning himself, which he described as follows: "They talked about me. Mr. Milke came and said to father he wanted to have me. He wanted to change my name. And father told him, 'No, because I need him myself.' Then he went away that day"; and that Milke further said in another conversation in his presence: "I tell you what I'll do. I'll give everything I have got if he does good, and mind like I want him, give him everything after my death. That is what he promised me, just what Mr. Milke promised me."

There is quite a material conflict between these accounts as to what the promise of Milke was. Plaintiff in his petition alleged and in his testimony stated, that the promise was made directly to him, but the promise, as testified to by his mother and stepfather, was to the latter for plaintiff's benefit. This difference is quite material with reference to the admissibility of the evidence. If the promise was to the plaintiff, he was plainly incompetent, under Code, section 4604, to testify thereto, for that section prohibits a party, in an action against the heirs of a deceased

1. EVIDENCE: communication with a decedent.

person, from testifying to personal communications made to him by the deceased. But the theory of plaintiff is, in fact, as indicated in argument, that the promise was made directly to the stepfather for plaintiff's benefit. If this be so, however, we think the stepfather was incompetent to testify with reference thereto, for plaintiff is claiming the benefit of such a contract made between Milke and his stepfather, and the section of the Code just referred to prohibits any person from, through or under whom the party derives any interest or title by assignment or otherwise, being examined as a witness in regard to any personal transaction or communication between such witness and the deceased.

Without regard to technical objections to the testimony of these witnesses, we reach the conclusion that the evidence is too indefinite and uncertain to sustain a decree awarding the property to the plaintiff. The case differs from many of those in which oral agreements to convey or will property are supported in the fact that plaintiff did not go upon the property to occupy it and make improvements. The circumstance of taking possession and making improvements, where it is found, furnishes a strong equity in favor of the claimant, and not only serves as the part performance which, under the statute of frauds, is necessary to render valid an oral contract to convey, but also tends to indicate that some promise was made. With reference to performance something further is to be said hereafter, but the absence of the circumstance of unequivocal action, in pursuance of the alleged promise, leaves the alleged promise itself without that cogent support which has been found in other cases where such promises have been enforced. See *Bevington v. Bevington,* 133 Iowa, 351, and cases therein cited. That the evidence to establish such a contract must be clear, definite, and conclusive has often been decided. *Briles v. Goodrich,* 116 Iowa, 517;

2. Real Property: oral contract to convey: evidence.

*Chew v. Holt,* 111 Iowa, 362; *Truman v. Truman,* 79 Iowa, 506; *Williamson v. Williamson,* 4 Iowa, 279.

Many witnesses for plaintiff testified as to declarations, made by Milke in his lifetime, relied upon to furnish additional proof of the existence of the contract. Conceding, for present purposes, that these declarations might be shown, we find that they were for the most part as to an intention, on the part of Milke, to give his property to plaintiff, and that they lend little countenance to the idea that he had already made such a definite and specific contract to do so as to prevent his changing his mind and refusing to carry out the arrangement if he saw fit. Such declarations of a deceased person, testified to by witnesses who say they heard them many years before their testimony is given, are entitled to very little weight. *Ellis v. Newell,* 120 Iowa, 71.

3. Same: declarations of a decedent.

As a condition of the contract testified to by plaintiff and his witnesses was that he should, in effect, conduct himself toward Milke in a way which should be acceptable to the latter, it becomes important to inquire what the relations of the parties were after plaintiff went to live with Milke under this alleged arrangement. It is quite satisfactorily shown that, until after plaintiff became of age, he resided with Milke, who was a bachelor and lived alone, save as plaintiff was with him, and that Milke treated him much as he would a son under similar circumstances. After becoming of age plaintiff still continued to make his home with Milke, although the nature of the services rendered does not very satisfactorily appear. For at least one year prior to their definite separation, to be hereinafter referred to, plaintiff seems to have worked the farm as a tenant for a share of the crops, and to have had a joint interest in the stock. There is a controversy as to whether, during the time plaintiff was thus living with Milke, the latter

4. Oral contract to convey land: evidence.

paid him wages, and there is some evidence of an admission, made by plaintiff during that time, that such wages were paid, at least during plaintiff's minority, to his mother and stepfather.  At any rate we find an absence of any very definite and conclusive showing that plaintiff, while residing with Milke, understood or claimed that he was doing so in reliance on a contract by which he was to receive property on Milke's death. In 1900 Milke and the plaintiff, in separate proceedings, were committed to a hospital for the insane, on account of mental derangement due to excessive alcoholism, and after their release some months later they lived apart.  Here again the testimony is in conflict and confusion, but we are satisfied that plaintiff did not continue to occupy any such relation to Milke as we would naturally look for if the plaintiff regarded the arrangement with reference to the property as continuing in existence and force.  Plaintiff was in the employment of others, and while he claims that he visited Milke on Sundays, and helped him about his farm, his testimony in this respect is almost entirely without corroboration. There is some testimony in behalf of plaintiff that Milke desired plaintiff to return, but this does not help out plaintiff's case.  If plaintiff absented himself from Milke's home contrary to the latter's wishes, then plaintiff were not performing the conditions of the alleged contract.  But the explanations as to this separation are various and unsatisfactory, and all we need say is that the relations of the parties after their return from the hospital was not such as to lend any support to the theory that plaintiff was still relying, if he ever relied, on a contract by which he was to be entitled to Milke's property on his death.

A few weeks before Milke died, and when he was very sick and alone, plaintiff did return and take care of him until his death, but immediately afterward, when the question of the temporary custody of Milke's property and its final disposition were under consideration, plaintiff

expressly said, in the presence of several witnesses, that he had no claim against Milke, except for his services during the last sickness, and he did not suggest, until after he had left the place and after the appointment of a temporary administrator on the application of Milke's heirs, that he had any claim to or interest in the personal property or the farm. The explanation given by plaintiff of this conduct is that he supposed he had no right to the property in the absence of some writing; but it seems to us incredible that, if plaintiff had, during all the years intervening between the making of the alleged oral contract in 1887 and the death of Milke in 1906, been engaged in the performance of the conditions of that contract under the belief and assumption that he should have this property on Milke's death, he would have made no claim that he was entitled to it when his rights had, according to his own theory of the case, become perfect. Plaintiff does not testify that on any particular occasion, or under any particular circumstances, he had been informed or become satisfied that a writing was necessary to enable him to enforce the contract under which he claims to have acted. His whole conduct can be consistently explained only on the theory that he had not been relying upon, or attempting to perform, the oral contract which is now the basis of this suit.

Without further detailing various considerations which occur to the mind in reading this record as having some bearing upon the credibility of the testimony of the various witnesses, it is sufficient to say that we are satisfied with the holding of the trial court that the contract relied upon has not been made out with the clearness and definiteness which ought to be required in such cases, and the decree of the trial court is therefore *affirmed*.

Supplemental opinion on petition for rehearing. Petition *denied*.

*R. Feyerbend* and *Springer, Clary & Condon,* for appellant.

*Smith & O'Connor,* for appellees.

PER CURIAM.—A majority of the court is now unwilling to be bound by the expression of the foregoing opinion in regard to the admissibility of the testimony of the foster father under Code, section 4604. Therefore, so far as this opinion is concerned, the action must be treated as based on a contract of the foster father for plaintiff's benefit, and the testimony of the foster father with reference to the making of such alleged contract is to be considered. But, as will appear by reference to the opinion, such evidence was fully considered, having been embodied in the record by the lower court, and we reached the conclusion that on the whole evidence the decree of the trial court was correct; and the petition for rehearing is therefore—*Overruled.*