EMERY STILES v. A. W. BREED, Admr. of the Estate of E. S. Stiles, Appellees; ELIZA ELLEN CRAMER ET AL., Heirs of E. S. STILES, Appellants, and ADDIE EAMES ET AL., Heirs of Harriett Stiles, Interveners, Appellants.

**Husband and wife:** CONVEYANCES: UNDUE INFLUENCE: PRESUMPTION:
1 EVIDENCE. In view of our statute, Code, section 3157, the mere relation of husband and wife is not sufficient to raise the presumption of undue influence in the execution of a conveyance by one to the other; there must be a further showing of mental or physical weakness, or such surrounding circumstances as to render the one peculiarly susceptible to the control of the other. In this action by the heirs of the wife to establish their interest in land conveyed by her to her husband, the evidence is held to overcome any inference of undue influence.

**Same:** CONVEYANCES: DELIVERY: EVIDENCE. Possession of a deed by
2 the grantee is presumptive evidence of delivery, and delivery will be presumed from the recording of a deed without evidence regarding the consideration paid therefor; but this presumption may be overcome by satisfactory evidence. In the instant case the evidence is held sufficient to show delivery of a deed from the wife to the husband.

**Oral contract to devise property:** VALIDITY: EVIDENCE. An oral
3 contract of the owner of property to adopt the child of another, by which he agrees to give the child all his property upon his death the same as his own child, provided the child lives with him until arriving at its majority, is valid; but the oral proof of the agreement must be clear, satisfactory and convincing. In this action the evidence is held sufficient to establish an oral contract.

**Same:** EVIDENCE: TRANSACTIONS WITH A DECEDENT. One who, at
4 the request of a parent, secures the adoption of a child by an agreement with the adoptive parent that the child shall have his

property on condition that it lives with him until arriving at majority, is not disqualified from testifying to the transaction by Code, section 4604, on the ground that he had an interest in or title to the property in controversy.

**Same:** CONTRACT TO DEVISE PROPERTY: VALIDITY. An agreement by which an adoptive child was to have all the property of his adoptive parent the same as though his son is not an agreement that the child shall inherit, and does not prevent the disposition of the property by will.

*Appeal from Franklin District Court.*—HON. CHARLES E. ALBROOK, Judge.

SATURDAY, MARCH 11, 1911.

ACTION to establish a right to property resulted in decree as prayed. The defendants and interveners appeal. *Affirmed.*

*John M. Hemingway,* for appellants.

*E. P. Andrews, David Evans* and *B. H. Mallory,* for interveners.

*Lundy & Wood* and *Clock & Clock,* for appellee.

LADD, J.—E. S. Stiles died intestate and without issue November 22, 1908. He left lots in Hampton and certain personal property derived from the sale of land. These lots and land were acquired by conveyance from his wife, Harriett, October 18, 1897. The defendants are the heirs of decedent and claim all the property by inheritance. The interveners are the heirs of Mrs. Stiles, and contend (1) that the deeds purporting to convey to decedent the lots and land were never delivered, and (2) that, if delivered, they were procured by undue influence exerted upon her by the grantee therein, and prayed that, as her

heirs, they be awarded the property left by decedent. The plaintiff is the son of one Jones, and claims the property under a contract alleged to have been entered into by decedent in February or March, 1867, by the terms of which he was to live with decedent until attaining his majority, and upon decedent's death was to take all his property as though his own son. In disposing of the case the appeal of interveners may be considered first, and then that of defendants.

I. At the time Mrs. Stiles signed and acknowledged the deeds conveying the lots and land to her husband, October 18, 1897, she was seventy-nine years of age, and her husband about ten years younger. She had

1. HUSBAND AND WIFE: conveyances: undue influence: presumption: evidence.

been bedfast for some time, and so continued until her death in 1901. The evidence is conclusive that she was a well-educated woman and above the average in intelligence. One witness testified that her mind was impaired and her conversation incoherent, but this was successfully controverted by the overwhelming weight of evidence. Nor are we inclined to accept the conclusion of another witness that she was in fear of her husband. Though he was often what the witnesses denominate "grouchy," the record bears convincing proof of his kindness, patience, and devotion to his wife throughout the period of her affliction. The situation then was this: The wife, though in full possession of her mental faculties and seventy-nine years of age, was bedfast and cared for exclusively by the husband. Should it be inferred therefrom that in executing the deeds to him without consideration, other than that of affection, she was unduly influenced by him? Section 3157 of the Code enacts that: "A conveyance, transfer, or lien executed by either husband or wife to or in favor of the other shall be valid to the same extent as between other persons." The mere relationship, then, is not enough to raise the presumption of undue influence. There

must be something in addition thereto, as that one or the other is weak-minded, as in *Paulus v. Reed,* 121 Iowa, 224, or, owing to the physical condition or surroundings, the one is rendered peculiarly susceptible to the control of the other. Notwithstanding the emancipation of the wife in her property rights, her situation and the nature of the relation exposes her to the machinations of a designing husband. When the relation is normal, she is affectionately anxious to please him. "When he commands, she obeys; when he persuades, she yields; when he gently hints a wish, she grants. When treated almost as a servant, when governed and corrected as a child, as did our sturdy ancestors, or when confided in as a companion and equal, her will is subdued to her lord. . . . Modern legislation has materially changed the common law respecting the rights and disabilities incident to the marriage relation. But the unity of person remains, resting on a foundation older than the common law, and the husband's influence over his wife, so strongly expressed by the common law writers, will end only with the marriage relation itself." *Darlington's Appeal,* 86 Pa. 512 (27 Am. Rep. 726). Said Gibson, C. J., in *Weeks v. Haas,* 3 Watts and S. 520 (39 Am. Dec. 39): "Her dependence on his is more entire than the dependence incident to any other of the domestic relations; and the law relaxes its grasp on no means within its power to prevent him from misusing it." In *Boyd v. De La Montagnie,* 73 N. Y. 498 (29 Am. Rep. 197), in discussing the proposition, Church, C. J., declared that: "A court of equity will interpose its jurisdiction to set aside instruments between persons occupying relations in which one party may naturally exercise an influence over the conduct of another. A husband occupies such a relation to the wife, and the equitable principles referred to would apply to them in respect to gratuitous transfers by the wife to the husband, however it might be in ordinary business transactions, which the wife may

legally engage in. When this relation exists, the person obtaining the benefit must show, by the clearest evidence, that the gift was freely and deliberately made. The burden is upon the person taking the gift to show that the transaction was fair and proper." 21 Cyc., 1293.

But for other evidence we should be inclined to regard the situation such as to justify the inference of undue influence. The wife was wholly dependent upon the husband for physical care and comfort, and, as said, the deeds were likely a gift to him. But such an inference is fairly overcome by the evidence adduced. It clearly shows that the purpose of so conveying the property had long been cherished by the wife. She had so stated to a neighbor repeatedly, and even the witness who thought her in fear of her husband testified that she had confided this much to her. She told of making the conveyances after this was done without apparent regret, and the lawyer who took the acknowledgments noticed nothing of hesitancy in her manner, though he remarked on the comely appearance of her hair. Moreover, she had joined the husband in the agreement hereinafter discussed, and these transfers did not divert the property from going to plaintiff as both had designed. The conveyances were voluntary.

II. Nor is there any ground for the interveners' contention that the deeds were never delivered. These were signed and acknowledged and appear to have been recorded March 6, 1901, shortly after the grantor's death. Probably they were handed to the recorder by the grantee, as assumed by interveners, but of this there was no evidence. The suggestion that they were found by him among the grantor's effects after death, as in *Reichart v. Wilhelm,* 83 Iowa, 510, is gratuitous. Were Stiles in possession of the deeds, this was *prima facie* evidence of delivery. *Parlin, O. & M. Co. v. Daniel,* 111 Iowa, 640; *Courtney v. Courtney,* 149 Iowa, 645. So, too, delivery by the grantor is presumed

2. SAME:
conveyances:
delivery:
evidence.

from the recording of the deeds. *Robinson v. Gould,* 26 Iowa, 89; *Craven v. Winter,* 38 Iowa, 471; *Foley v. Howard,* 8 Iowa, 56; *Hutton v. Smith,* 88 Iowa, 238; *McCrum v. McCrum,* 127 Iowa, 540; *Webb v. Webb,* 130 Iowa, 457; *Davis v. Hall,* 128 Iowa, 647. Interveners argue that the reason for the presumption of delivery of a deed duly signed and acknowledged, from possession or recording, arises from the fact that one having paid a valuable consideration is presumed to have received the thing he bought at the time he 'parted therefrom. But the presumption arises without evidence of whether consideration has been paid. Of course, the presumption is rebuttable, and may be overcome by any satisfactory evidence. It is evidently based on the notion that, as only instruments duly delivered are recordable, such delivery should be inferred, rather than the surreptitious act of handing a deed never delivered to the recorder. Here the husband had sold the land and been in possession of the lots over seven years, and in the absence of any other evidence, save that of a neighbor saying the grantor told 'her she had transferred the land to her husband, we are of opinion there was sufficient proof of delivery. There was no error in dismissing interveners' petition.

III. That a contract such as alleged may be enforced was decided in *Chehak v. Battles,* 133 Iowa, 117. There the contract was in writing, while in this case oral evidence is relied on. The only difference is

3. ORAL CONTRACT TO DEVISE PROPERTY: validity: evidence.

in the manner of proof. Such an agreement, if resting in parol, must be fully established by clear, satisfactory, and convincing evidence. *Wales v. Holden,* 209 Mo. 552 (108 S. W. 89); *In re Baner's Estate,* 76 Neb. 652 (107 N. W. 993); *Smith v. Lull* (Neb.) (115 N. W. 1002). As remarked in *Dicken v. McKinley,* 163 Ill. 318 (45 N. E. 134, 54 Am. St. Rep. 471): "Such a contract, however, is looked upon with suspicion, and is only sustained when estab-

lished by the clearest and strongest evidence." ' And in *Kinney v. Murray,* 170 Mo. 700 (71 S. W. 199): "The proof of such a contract must be so cogent, clear, and forcible as to leave no reasonable doubt in the minds of the chancellor as to its terms and character."

Samuel Jones, a shoemaker, came to Hampton in 1866. In the fall of that year his wife died leaving two children, a son and daughter. The record does not disclose what became of the latter, but the son is the plaintiff in this case, and now superintendent of the animals in Goldmar Bros. Show. He was born February 17, 1864, and lived with E. S. Stiles and wife at the Phoenix Hotel, in Hampton, from March, 1867, until he was twenty-one years of age. It seems that in February or March, 1867, a party was about to start for Montana to prospect for gold, and Samuel Jones accompanied it. At that time North, one time county judge, N. B. Chapman, an attorney, and James Thompson, who had been county treasurer, resided at Hampton. North and Chapman are dead, but Thompson testified, and his depositions were introduced in evidence. Though eighty years of age, his testimony bears little evidence of impaired memory. His story is that Jones, prior to having left for Montana, talked with North, Chapman, and himself, with whom he had become intimately acquainted in the organization of a Masonic lodge, about this boy, saying that he would accompany the party going to Montana but for the boy, and "wanted to know if the three men would take charge of him and find him a home; have him adopted in some good family;" that this they promised to do; that North took the boy to his home; that about two weeks later North informed Chapman and the witness that Stiles wished to adopt the boy and had been at his house to see him; that shortly afterwards the three visited Stiles' Hotel and talked the matter over with Stiles and his wife; that, quoting: "We told them that we had authority from Mr. Jones to find

a home where the boy could be adopted; that we understood that they wanted a boy and we had come to talk it over with them, and told them they could have the boy if they would adopt him, give him their name, send him to school, and take care of him and keep him until he was of age, and that at their death, if he outlived them, that he was to have their property, and they said they would take him and give him the name of Emery Stiles and treat him as their own son, and that if he outlived them, that at their death he should have their property the same as though he were their own son." The witness, though expressing himself in somewhat different language, gave substantially the same account of the transaction orally and in another deposition. He did not pretend to repeat the language used, but was positive as to the substance of what was said. He described the boy as older than he was, and had no recollection of the girl. John North, a son of Judge North, testified to having taken the child to the hotel of Stiles with his father. This is in harmony with Thompson's story, for the three men doubtless visited the hotel after Judge North had told them Stiles desired the child. Nor is Thompson's testimony inconsistent with that of Davidson, who related that Stiles and his wife had consulted him as an attorney about preparing adoption papers; that he had informed them that, in event of adoption, the child would inherit their property; that they decided not to execute adoption papers, as they did not wish him to be their heir, and wished to see how he would turn out. Had adoption papers been executed he would have been their heir, even though he left the next day, or at any time; but under the alleged arrangement he must bear their name and live with them until twenty-one years of age to be entitled to their property. There was sufficient reason for retaining the child under the alleged agreement rather than by adoption, and the testimony of

Davidson is not necessarily in conflict with that of Thompson.

The evidence is conclusive that plaintiff complied with all the terms of this alleged agreement, and greatly endeared himself to his foster parents. They loved him as an own son, and though, upon attaining twenty-one years of age, he left them to follow a pursuit he had chosen, he kept in touch with them through correspondence as long as they lived. They uniformly referred to him as their son, and freely expressed their intention that he should have their property after they had departed this life. While this may indicate a future purpose, it is entirely consistent with the alleged agreement, and, as it relates to the same subject matter, should be regarded as somewhat corroboratory thereof, especially when the expression of the intention that he was to have their property was mentioned in connection with his adoption. But there was better corroboration. Mrs. Kellogg testified that Stiles and his wife had said to her many times that they had adopted plaintiff, and that "the purpose was to have an heir to leave their property to," and that "the boy was to have it." The boy, as Stiles declared, was a "born showman," and on two occasions left home to follow the circus. After he had returned from the last trip, the deceased approached C. W. Boutin, telling him of the high esteem in which he was held by plaintiff, and requested him to undertake to persuade him not to leave again, saying that the boy "always thought a gread deal of you, and you would have more influence over him than anybody else, and I want him to stay with me. I need him now, if I ever did. He is a good boy to work, and we want to impress upon his mind as much as possible what he is losing if he leaves home now. It will only be a few years—he has only got to stay here a few years longer to get what is coming to him.". Boutin did not pretend to give the words of deceased, but testified that he repeated the above in substance

several times, and said that he wished him to explain to Emery what he would lose if he left them, and told him of his nice farm to live on; that he would lose all his interest in everything if he left; but if he stayed with him four or five years he was to have the property. Boutin testified to having talked with the boy as requested, and this was confirmed by plaintiff. John North testified that on one occasion when men were planting willow trees on Stiles' farm Stiles said to plaintiff that they were not working for him. "The boys are working for you; this is all yours. These boys are not working for me; they are working for you." Jewell testified that Stiles had said, "The boy would get all the property. Mrs. Stiles had said the same thing to him and explained to his wife." Burres testified that Stiles had explained to him that "they adopted him, and that they expected him to have their property." On the other hand, one Roberts related that Stiles had said to him that plaintiff would have had his property had he done as he wanted him to do, but as it was he would not get a cent. Another witness told of Mrs. Stiles showing her fine clothes and saying that she expected her property to go to Stiles, and after that "she wanted her folks to have this property." One of the heirs testified that Stiles had said, when on a visit in New Jersey, that it was lucky he had not adopted plaintiff, "as he cared nothing about us." As against the overwhelming weight of evidence establishing different purposes and relation than the evidence of these witnesses indicate, we are not inclined to accord it any considerable credit. Stiles may have said what is attributed to him by Roberts in bad humor, and Mrs. Stiles may have referred to her gowns in saying she desired "her folks" to have the property.

It seems incredible, in the light of this record, that deceased ever said anything conveying the idea that his relations with plaintiff were not satisfactory. He did object to his pursuit as a caretaker of wild animals, and

though himself addicted to the habit of attending shows, wept upon first seeing his son riding the elephant; but he spoke of him as a "born showman" with evident pride, and whenever an exhibition with which plaintiff was connected was given within reach he attended, in order to see "his boy." Our design has been to mention the evidence which has convinced us that the agreement was entered into as testified by Thompson, without reviewing it in detail. Stiles and his wife were childless and without hope of progeny. His relatives lived in New Jersey, and after locating at Hampton he does not appear to have visited them until 1906. But a niece and brother-in-law of Mrs. Stiles lived in Iowa. So that there seems to have been little to have influenced them against entering into an agreement such as alleged, and though we might hesitate about finding it to have been established by the testimony of the one witness, given forty-two years after the transaction, the corroboration is such as to have thoroughly convinced us, upon a separate examination of this record, of the existence of the contract as alleged. Some decisions are cited in which different conclusions were reached, but these differ so radically in their facts as not to be controlling, nor, indeed, of much assistance.

IV. It is contended, however, that James Thompson was incompetent, under section 4604 of the Code, to testify that in behalf of the father of plaintiff, he and his associates entered into the contract with Stiles and wife. That section reads: "No party to any action or proceeding, nor any person interested in the event thereof, nor any person interested in the event thereof, nor any person from, through or under whom any such party or interested person derives any interest or title by assignment or otherwise, and no husband or wife of any said party or person shall be examined as a witness in regard to any personal transaction or communication between such witness and a person at

4. SAME: evidence: transactions with a decedent.

the commencement of such examination, deceased, insane or lunatic, against the executor, administrator, heir at law, next of kin, legatee, devisee, or survivor of such deceased person or the assignee or guardian of such insane person or lunatic. . . ."

The witness was not a party, nor interested in the event of the suit, and therefore was not disqualified on either of these grounds. *Nearpass v. Gilman,* 104 N. Y. 506 (10 N. E. 894); *Darwin v. Keigher,* 45 Minn. 64 (47 N. W. 314). Nor had he at the time he testified, or at any time, any interest in or title to the property in controversy. He was not a person, then, "from, through or under whom" the plaintiff derived "any interest or title by assignment or otherwise."

The design of the statute is to guard against the temptation to give false testimony in regard to the transaction in question on the part of the surviving party, and further, to put the two parties on terms of equality in the opportunity of giving testimony. 3 Jones, Evidence, section 730. To effectuate this, three classes of persons are precluded from giving testimony concerning such transactions: (1) Parties to the suit: (2) those interested in the event thereof; and (3) those who may be influenced because of the devolution of title to or interest in the property in controversy. "From, through or under" has reference to the origin or devolution of property, and, unless some title to or interest therein has been derived by "assignment or otherwise" from the party adverse to the estate, the section has no application. By "otherwise" is meant in another manner or way, as by devise or descent. Contrary to what was intimated in *McClanahan v. McClanahan,* 129 Iowa, 411, by express provision of the statute, the title or interest must have been derived "from, through or under" the witness, in order to render him incompetent.

To say that any title or interest was derived "from,

through or under" Thompson, as agent, would be a misuse of the word "derived." According to Webster's dictionary, it means, "To receive, as from a source or origin; to obtain by descent or transmission. . . . To draw, deduce, obtain, followed by 'from;' to trace the origin, descent, or derivation of; to recognize. transmission of." As said, the language of the statute has reference to the devolution of title to or interest in the property in controversy. Since an agent is not interested in the result of. the action, nor bound by the judgment, he is deemed an impartial witness. 3 Jones, Evidence, section 794. As bearing hereon, see *Boeck v. Wilke,* 141 Iowa, 713; *Cobb's Adm'r v. Wolf,* 96 Ky. 418 (29 S. W. 303); *Whitman v. Foley,* 125 N. Y. 651 (26 N. E. 725); *Bouton v. Welch,* 180 N. Y. 116 (63 N. E. 538). See *Rosseau v. Rouss,* 179 N. Y. 438 (72 N. E. 916); *Hanf v. N. W. Masonic Aid Ass'n,* 76 Wis. 450 (45 N. W. 315); *Zerbe v. Reigart,* 42 Iowa, 229. In Indiana and Georgia an agent of the adverse party is expressly declared incompetent to testify to a transaction with a person since deceased. *Assurance Co. v. Brim,* 111 Ind. 281 (12 N. E. 315); *McCamy v. Cavender,* 92 Ga. 254 (18 S. E. 415). In *McClanahan v. McClanahan,* 129 Iowa, 411, the witness held to have been incompetent was the person through whom the trust fund was acquired, and therefore not in point, though dicta may be found in the opinion contrary to the conclusion here reached. We are of opinion that the evidence of Thompson was admissible.

V. The agreement was, not that plaintiff should. inherit, but should have the property the same as though he were their own son. This did not prevent its disposition by will, nor undertake to confer on him the right of inheritance, but measured the interest he was to have by likening it to that which a son would inherit. *Affirmed.*

5. SAME: contract to devise property: validity.

EVANS, J., took no part.