JAMES J. SHARPE, JUNIOR, et al., Appellants, v. MARGARET JANE WILSON et al., Appellees.

WILLS: Contract to Devise or Bequeath—Parol Contract—Degree Of Proof. A parol contract to will or devise property is enforceable if established by proof which is so cogent, clear and forcible as to leave no reasonable doubt as to its terms and character. Evidence reviewed, and held wholly insufficient to meet this rule.

*Appeal from Franklin District Court.*—R. M. WRIGHT, Judge.

JANUARY 20, 1917.

REHEARING DENIED NOVEMBER 17, 1917.

THIS action was originally brought in partition. Thereafter, two of the parties to the suit filed an amended and substituted petition, claiming all the property involved in the original suit and all other property owned by decedent at the time of her death, alleging that they acquired such right under a contract made by their father with the decedent for their use and benefit. The opinion states the facts. Judgment for the defendants in the court below. Plaintiffs appeal.—*Affirmed.*

*E. P. Andrews* and *Jno. M. Hemingway,* for appellants.

*Healy, Burnquist & Thomas, Clock, Saley & Clock, Senneff, Bliss & Witwer,* and *Burnquist & Joice,* for appellees.

GAYNOR, C. J.—Susan M. Parriott died on February 19, 1912, intestate, leaving a large estate. She was a widow,

without issue. Her only heirs were her brothers and sisters and the children of a dead sister. She left surviving her 3 brothers and 2 sisters, and the children of a dead sister, 7 in number. One of the brothers, James J. Sharpe, Sr., known hereafter in this record as Joe Sharpe, soon after her death transferred all his interest in her estate to his children, 4 in number, known in this record as Eva, Henry, James J., Jr., and Luke.

This action was originally commenced by James J. Sharpe, Jr., one of the assignees of the interests of the brother Joe Sharpe, and Moore I. Sharpe, one of the brothers of decedent, against the other brothers and sisters and the heirs of the dead sister, to partition the real estate left by the deceased, making Luke, Eva and Henry Sharpe also defendants as assignees of Joe. In this suit, the brothers and sisters claimed their individual right as heirs; the children of the dead sister as the heirs of the dead sister; James J. Sharpe, Jr., Luke, Eva and Henry, as the assignees of the brother Joe. A hearing was had upon this petition, and a decree rendered on the 11th day of February, 1914. However, before the decree was executed, a petition was filed by two of the assignees of Joe Sharpe, James J. Sharpe, Jr., and Luke Sharpe, praying that the decree be set aside and the case re-opened. Upon this application a new trial was granted, and on the 11th day of November, 1914, James J. Sharpe, Jr., plaintiff in the original suit, and Luke Sharpe, defendant in the original suit, filed their amended and substituted petition, in which they allege that they are the absolute and unqualified owners of all the property described in the original petition, and of all personal property and all other property of whatsoever kind, whether real or personal, of which the said Susan M. Parriott was the owner at the time of her death. They based their claim upon the following allegations:

"That these petitioners became the owners thereof by

virtue of the fact that, in the latter part of 1908, J. J. Sharpe, their father, known as Joe Sharpe, surrendered and gave them into the charge of Susan M. Parriott; that they were, at that time, minors; that their father surrendered them to Susan M. Parriott on that date, under an oral contract and agreement entered into between J. J. Sharpe, Sr., their father, for and in their behalf, with Susan M. Parriott, in which it was agreed that said J. J. Sharpe, Sr., should surrender these petitioners to the said Susan M. Parriott, who should have full and exclusive control of them, the same as if they were her own children, until they became of age; that Susan M. Parriott on her part promised that she would take and receive them as her own, and educate and treat them as her own children, and at her death would give to them whatever property she might then own and be possessed of; that, in pursuance of this agreement, Susan M. Parriott took complete and exclusive control of these petitioners and received them as members of her family, educated them, and treated them as her own children until her death; that they did not learn of this fact until after the institution of the original suit, and not until the 12th day of April, 1914."

They pray that they be declared the owners of all the property of which Susan M. Parriott died seized or possessed, whether the same be real or personal property. An issue was tendered on this claim, the cause tried to the court, and a decree entered dismissing this petition. From this, James J., Jr., and Luke appeal.

The right of these plaintiffs to recover upon proof of the allegations made is no longer a mooted question in this state. See *Stiles v. Breed*, 151 Iowa 86; *Horner v. Maxwell*, 171 Iowa 660; *Finger v. Anken*, 154 Iowa 507. The disposition of this case, therefore, involves no unsettled question of law. It resolves itself into a fact controversy alone. This question presents itself: Have these plaintiffs established

the rights claimed by them by such a quantum of proof as the law requires of them in cases of this kind? It is the holding of this court that such an agreement as here sought to be enforced, resting as it does on parol, must be established by clear, satisfactory and convincing evidence. Some courts hold that such a contract is looked upon with suspicion, and is only sustained when established by the clearest and strongest evidence. Other courts hold that the proof of such a contract must be so cogent, clear and forcible as to leave no reasonable doubt in the mind of the chancellor as to its terms and character. Our latest pronouncements approving this rule are *Boeck v. Milke,* and cases therein cited, 141 Iowa 713, at 717; *Stiles v. Breed,* 151 Iowa 86, at 91.

The ingenuity of the human mind is sometimes astonishing, especially when called into service by the exigencies of its own contrivance. The mind, responding to the things that are, usually gives active recognition to the things that are. In giving expression to the human mind, the things that are find first and readiest recognition and expression. The normal man, possessing a knowledge which, asserted, brings profit to himself, usually does not conceal that knowledge when the bringing of it into active use will redound to his own advantage. Usually, when men make contracts involving great interests to themselves or to those they love, they do not conceal the existence of the contract when the time arrives for the harvest.

In this case, we have the following facts disclosed by the record, and not disputed:

Susan M. Parriott, the decedent, was a woman of considerable business ability. Her husband died in 1875. She never remarried. On his death, she became the owner of a large estate. So far as this record shows, she managed and controlled the estate herself up to the time of her death. She had brothers and sisters with whom she was on the very

best of terms, for whom she entertained most kindly feeling. In no part of the record can we discover that she entertained any more kindly feeling towards Joe Sharpe and his children than she entertained towards her other brothers and sisters and their children. All were welcome at her home. Many of them were entertained there, and she at theirs. She was more abundantly supplied with this world's goods than most of her brothers and sisters. She never had any children. Her brothers and sisters seemed to be abundantly supplied in this way. As said before, her husband died in 1875. After the death of her husband, she made her home a great deal of the time with her sisters, Mrs. Wilson and Mrs. Stockdale.

For some years before moving to her home in Hampton, she made her home with her sisters. She moved to Hampton in 1897. It is at about this time that the contract is alleged to have been made between Joe Sharpe and Mrs. Parriott under which these plaintiffs are claiming all her property. At this time, Joe Sharpe was living on a farm in Hamilton Township, in Franklin County. He had five children. His first wife died in 1896. At that time, the youngest child was an infant. This youngest child was born in March of that year and died the following September. The plaintiffs in this suit are two of his children. After his wife died, Mrs. Parriott came to his home and cared for these children. Prior to this time, Mrs. Parriott had been living with her sisters; some part of the time had a home in Ackley. She stayed with her brother Joe and took care of his children until such time as another was produced to take her place, a Mrs. Mallou. Joe Sharpe was a witness in this suit. He is the one by whom the plaintiffs seek to establish their contract. He is the one with whom it is claimed Mrs. Parriott made the contract. His testimony as to the contract is that Mrs. Parriott took Luke to her home in Hampton in the spring of 1897, and J. J., Jr., in the fall

of 1898. His sister wanted to adopt the boys, and he objected because they would have to change their name. This was after the children had been taken by her. Some question had arisen as to the payment of tuition for the older boy while attending school at Hampton.

"She said, 'Let me adopt the children as my own, and there won't be any trouble about this tuition business.' I said, 'Does that mean that the children would have to change their name?' and she said, 'Yes.' 'Well,' I said, 'I won't consent to have the children's name changed.' I then requested her to bring the children back, and that there would then be no question about tuition. She said, 'I can't part with them, Joe. I want the children, and I can't part with them.' She cried. I insisted that she bring the children back. She then said that, if I would let her take the children and keep them, she would educate them, clothe them, and take care of them like her own children, and she said, 'Joe, when I am gone, they will have what I have got.' I said, 'Susie, take them.' She took them. I have exercised no control over them since. They remained with her since that time up to the time of her death. They have never lived with me since."

It appears that, soon after the boys left, he was asked by his partner, Armstrong, what had become of the boys, and he said, that they were off on a vacation. The oldest boy was 27 years old at the time of the trial. The youngest boy was 21. Never in all these years did Joe mention this alleged contract to these boys; never during all these years did he again refer to the contract and conversation with Mrs. Parriott. His oldest daughter, Eva, was on the witness stand, and testified that she never heard of this claim until after the death of her aunt, although, for some portion of the time, she resided with her father. Eva and her father came to Hampton upon hearing of the death of the aunt; came together on the train. Eva testifies that he never

mentioned this alleged contract to her. The fact disclosed by this record is that he never mentioned it to anyone until he communicated it to J. J., his son, on April 12, 1912.

It appears that, in the fall of 1898, Joe Sharpe married the second time; that he moved to Boone in 1902; that his second wife died there in 1903; that in 1904, he went to Dakota; that while there, he corresponded with his sister and his boys, and his sister frequently wrote him, but no letter is produced in which this contract was referred to, nor does he claim that he ever received any letter in which this contract was referred to by Mrs. Parriott. On the death of the second Mrs. Sharpe, in 1903, all the children visited Joe in Boone. After her death, Joe and all his children came to Mrs. Parriott's and stayed some time. There was no mention of this alleged contract, either by him or Mrs. Parriott.

About a year before Mrs. Parriott's death, J. J., Jr., visited his father in Dakota; was there about two weeks; no mention made of this alleged contract. While Joe was in Dakota, both Eva and Henry stayed with Mrs. Parriott. Henry stayed there for some time and attended school. None of these children claimed to have ever heard Mrs. Parriott mention or refer to any such agreement as is claimed in this suit. In fact, they affirm that nothing was ever said to them by Mrs. Parriott to the effect that her property should pass as claimed in this controversy.

In 1910, or about that time, his sister Mrs. Griggs died. Joe returned from Dakota to attend the funeral; went to Mrs. Parriott's home and stayed there some time. The boys were then approaching manhood. No mention was then made of the alleged agreement, nor does he claim that at this time he had any conversation with Mrs. Parriott touching these boys. On learning of Mrs. Parriott's death, and on his way to the funeral, in company with his daughter, Eva, then a young woman, he expressed no anxiety about

the disposition made of this property. If the contract had been made, the harvest time had arrived. On arriving, he made no inquiry as to whether Mrs. Parriott had executed a will or not, though he says he thought this necessary to make the contract effectual. J. J. was appointed administrator of the estate, and not until after his appointment was any investigation made to ascertain the existence of a will. But even in the search then made, no mention was made by Joe of this alleged contract, although he claims now that he thought that the contract was to be consummated by a will, or that she would make a will in pursuance of the contract, and give to these boys what he claims she agreed to give them. Though believing all the time that a will was necessary to make this contract enforcible, at no time, on discovering no will, did he express any surprise or refer to this contract, or complain of his sister and her failure to make a will. The record affirmatively shows that he expressed no surprise, made no complaint and exhibited no regret on finding no will.

After the death of Mrs. Parriott, he talked freely with his sisters about their share in the estate, and to one of the sisters gave advice as to the use she ought to make of her share when received; recognized his sisters as the legitimate heirs of Mrs. Parriott; recognized himself as an heir, and assigned all his interests, not to these two boys alone, but to his four children, share and share alike.

His silence and all his conduct, during all the years, speak eloquently against this claim. We think this claim had its suggestion in the fact alone that his sister took these boys into her home, cared for them, clothed, fed, and educated them at her own expense, and that they remained there until her death. But it is not believable that she agreed to give them all she had, upon her death, to the exclusion of her brothers and sisters and nieces and nephews, for whom she had done little during her lifetime compared

with what she had bestowed upon these boys. There was nothing in the conduct, character or relationship, at the time this contract is alleged to have been made, that could have induced so beneficent a gift. It is not pretended that Joe was her favorite brother. It cannot be assumed that these nephews were dearer to her then than the children of her sisters. No fact is shown in this record tending to make these children dearer to her at that time than were the others, beyond the mere fact that they were motherless, and, to some extent, neglected. This might excite her pity, her sympathy, her desire to relieve them of the embarrassment of their then environment, but nothing is shown in her relationship to them or to their father from which a motive can be found for the contract relied upon. It may be insisted that her care of them for all the years would suggest a tenderness, but it must be borne in mind that the father married soon after these children came to her; that the children were not agreeable to the stepmother. This stepmother died in 1903, and the father never remarried; moved to Dakota in 1904, and lived upon a ranch, where there were slight opportunities for the education and development of the children. Eva did not always remain at home with her father, but stayed a portion of the time with her relatives, and attended school. Henry was a considerable time at Mrs. Parriott's, attending school. The father seemed to be contented to allow the children to be cared for by others. This may have been due to conditions over which he had no control. The fact that they remained there, under the conditions existing, has not much probative force in favor of their present claim. Mrs. Parriott's home seems to have been open to all her relatives who desired to come to her. Others of her nieces and nephews stayed with her and attended school during this time. She seemed to be generously fond of her young folks, and her heart was big enough for them all.

Joe's testimony, as it appears in the abstract, discloses the following facts:

"Went to North Dakota in 1904. Did not come back to visit for about three years. Wrote the boys and Mrs. Parriott quite frequently, and Mrs. Parriott wrote me quite often. Was in Dakota four years before Eva came. (Eva was the oldest child.) Eva was with her grandmother Lee and with her uncles. I think she was at Mrs. Parriott's part of the time. Don't know that she went to school in Hampton and stayed at Mrs. Parriott's. Henry did. I came down and got Henry in 3 years. Eva came herself. Went from Iowa Falls to Boone in 1902. My second wife died there in 1903. After my second wife died in Boone, I went to Mrs. Parriott's. I was in Boone about 9 months. The boys did not visit me at Boone. They came down to the funeral. In recess and during vacation, my other 2 children, Eva and Henry, visited frequently with Mrs. Parriott. After my wife died at Boone, I was at Mrs. Parriott's about 2 months. All my children were there. No, Eva was going to school in Iowa Falls. I lived on a ranch for a number of years in Dakota. I came to Hampton when my brother-in-law, Stockdale, died. Then I came when my sister Mrs. Griggs died. That was 4 or 5 years ago. Went home with Mrs. Parriott from the funeral. Stayed there possibly 2 nights. Heard from the boys and Mrs. Parriott frequently. Was notified of Mrs. Parriott's sickness by letter from one of the boys, and the same day a telegram notifying me of her death. Jim visited me once in Dakota when Eva was sick, in about 1912. Stayed there about 2 weeks. Henry did not stay at Mrs. Parriott's and go to school when I lived in Iowa Falls. When I was at Boone, Henry boarded at Stockdale's and went to school. He may have lived at Mrs. Parriott's for a while."

He further testified that, while he lived at Iowa Falls, before he went to Boone, and after Mrs. Parriott took the

children, he visited them at Mrs. Parriott's at least once a month.

We set this testimony out for the purpose of showing the splendid opportunities afforded Joe to mention or discuss this alleged contract prior to the 12th day of April, 1912, and to emphasize his silence. If this case rested upon Joe's testimony alone, the claim could not stand, on the face of what this record discloses.

It is contended, however, that Mrs. Parriott, soon after these boys came to her, made statements to certain witnesses from which it is made manifest that she had entered into such a contract as is relied upon here, and such as imposed upon her the obligation sought to be enforced here against her estate. These conversations are said to have occurred about the time that some controversy arose between Mrs. Parriott and the school board touching an obligation to pay for the tuition of the elder boy, or perhaps both boys. She seems, so far as this record shows, to have entertained the idea that, because the boys were living with her and making their home with her, she, being a large taxpayer, ought not to be required to pay tuition for the schooling. It appears that she made some complaint to her brother Joe on this score. It appears that she talked about this, scolded about it, and so contended with the board. It seems that she had some talk about her school board troubles with one William Barry. The exact time when this conversation occurred does not definitely appear. We take it, however, that it occurred in 1899 or 1900. At that time, the Barrys lived across the road from Mrs. Parriott. He was asked this question, on direct examination:

"Now did she state to you while you lived there the manner and terms under which she had the boys? A. Yes, sir. Q. Now tell the court what she said about that. A. She said when she took these boys she wanted to adopt

them, and their faither wouldn't have any adoption papers taken out, for the reason that they would lose their name, and so they entered into a contract that she was to take them, verbally, and to take care of them and educate them as her own, and at her death what she possessed was to go to them; that the father agreed to this. This conversation was about 14 years ago. Q. Whom did you first tell this to about your talk with Mrs. Parriott? A. Well, I and my wife, I guess,—until this affidavit came up, that was about the first time that I talked. Joe Sharpe came to ask me to make this affidavit. He came in May or June last summer. Until Sharpe came, I think I had not talked to anyone except my wife about it."

He was then asked this question:

"Will you tell me again what Mrs. Parriott said? A. That she wanted to adopt those boys as her own, take out adoption papers, and their father refused to do that on account of losing their name, and then they entered into a verbal contract that she was to take them, educate them, take care of them as her own, and at her death what she possessed was to go to these children. Q. Now those were her words? A. Yes, sir. Q. She said, 'Mr. Barry, when I took these children the father and I entered into a verbal contract,'—she used that expression exactly, did she? A. Yes, sir. Q. That is clear in your mind that she used those words? A. Yes, sir, clear in my mind as the day she said it. I was talking in the road between her place and mine, just outside the gate. She opened the subject. She brought up the subject there in regard to the school board here. That is what brought up the subject, about the tuition. She said she had some talk with the school board, but didn't go into details on that part of it. I drove off, I was in a hurry. I think our conversation ended about there at that time."

One J. J. Wirt was called. He testified that he lived near to Mrs. Parriott, and that, during the time he lived

there, she was a frequent visitor at his house. He testifies that the first conversation was in 1899, in the spring. He was then living at the place where Wm. Barry formerly lived; he succeeded Barry at this place. He was asked this question:

"Did you ever have any conversation with her as to how she took these boys, and as to how she held them? You may tell what she said about them. A. She said she took the boys when they were quite small, and wanted to adopt them, and her brother wouldn't let her adopt them on account of the change in the name, and then she said she didn't want to give the boys up. She had become attached to them and they were like her own children, and she finally said—agreed with her brother to enter into a contract with him, and she was to take these boys and care for them the same as if they were her own children, and educate them, bring them up, and have full control of them as a parent. She said then she agreed with her brother if he would agree with this agreement that she would make them her heirs, and was to give them the property if she had any left. She said that her brother agreed to this proposition."

He further testified that the first time he talked of this conversation was with his wife; that was about the time he knew the suit was coming on. He said:

"We talked it over by ourselves. I had a second talk with her at her home. It came about in this way: I asked her again about this conversation, because we were talking about it. I said to her, 'You told me once what it is, but I don't remember it, and I would like to know it all over again.' My recollection is distinct back 15 years as to these conversations. My mind is clear, very clear, but I don't remember word for word what I testified to last October. In stating what Mrs. Parriott said, I understood that I was giving word for word what she said. My second con-

versation was about a year after the first. At this second conversation I didn't recall word for word what was told me on the first conversation, but I recall it this afternoon. The conversation came up in connection with the tuition. My wife was present and heard the conversation."

He was asked this question:

"You were not mistaken as to the exact language that the woman used in talking with you while you were there? A. Not when it makes an impression on me like that did."

Mrs. Wirt testified that Mrs. Parriott came to her home once or twice a week while she lived at the Beebe place. She was asked this question:

"Do you remember the conversation had in the presence of your husband as to how she took the boys? A. I do. Q. Tell the court what it was. A. She said that she would take the boys; wanted to take the boys as her boys; educate and clothe and care for them the same as if they were her own children, but her brother wouldn't consent to that on account that he did not want to change their name; and she said also that she came to a settlement with him—an agreement with him—that she would take the boys and care for them, and when she died these boys would get all the property she had; that her brother consented to this. That is just what she said."

On cross-examination, she was asked:

"Mrs. Wirt, you testified last October? A. I did. Q. Now will you tell us, without my interrupting you, just tell the court, what Mrs. Parriott said to you about these children? A. I said that she wanted to adopt these children and care for them, and clothe them and educate them, but on account of the changing of the name her brother wasn't willing she should. (Question reread.) A. I just gave you that. (Question repeated.) Do you want me to repeat it again? Q. No, I do not. Is there anything further? A. No, sir."

Redirect examination:

"Q. Do you mean that all she told you was that she wanted to adopt these children and care for them and educate them as her own, and that he objected to it on account of changing the name? Do you mean that was all that she said at the time, or did she say more? A. I think that is what she said. Q. Was there anything more? A. No, sir. Q. Did she say anything to you about a contract that she had made with him? A. Why, as I said before, a verbal contract. Q. Was that all that was said, that she just simply said she wanted to adopt the children, educate and take care of them, or that she did, and that he objected on account of losing their name? A. I think she said that she wanted to take the children and keep them as her own. Q. Did she say anything further? A. Why, she said she entered into a verbal contract with him."

Question by the plaintiff: "In addition to saying that she was to adopt the children and educate the children and take them as her own, but he wouldn't do it on account of losing the name, did she say anything more to you at that time about what was done? If so, state. A. I don't remember that she did. Q. Well, you said a while ago that they entered into a contract, didn't you? A. Why, into a verbal contract. Q. Did she tell you what the contract was? A. No more than she wanted to. She would take the boys and care for them and educate them as her children, and he was willing for that."

If we could accept this testimony, it would have much persuasive force in favor of plaintiff's claim. If we could believe that these witnesses, uninfluenced by the hypnotic power of suggestion, had, of their own independent memory, after these intervening years, reproduced for us the conversations had with the deceased as they were actually had, we might be persuaded to give ear to plaintiff's contention. These witnesses are comparatively old people. They had,

at the time, no personal interest in the matter concerning which they are called upon to testify. There is no reason in the world why they should have retained this in their memory,—why it should have reposed there silently all these years, unimpaired by the lapse of time. That they had talked with Mrs. Parriott, we may assume. That this talk related to the children and her wish to avoid payment of tuition, we may assume. This much might well be retained in the memory. The rest might readily come from the building process of suggestion. Joe and his son, J. J., Jr., were searching for evidence of this character. They had consulted attorneys and knew what was essential to make a case of this kind. Barry's attention was first directly called to this conversation by these parties when they approached him to have him sign an affidavit, presumably for the purpose of the new trial hereinbefore referred to.

It has long been recognized in this state that testimony of this character is not very persuasive in its probative force. Its weakness lies in the fact that the witness may not have understood clearly what was said to him. The imperfection of the human memory renders it quite possible, and, when long years intervene, quite probable, that he does not remember just what was told him, even though he understood it at the time. These witnesses may be honest in thinking that they remember now what was said to them so long ago. There is a remarkable similarity in their statements. Though professing to give the exact words used by Mrs. Parriott, they cannot repeat the conversations twice in the same way. Of course, that it not particularly remarkable, and ought not to be remarked upon now, except that the witnesses so positively assert that they clearly remember the language used by her in the conversations. There was, no doubt, some foundation to build upon. No doubt they had some conversations with Mrs. Parriott touch-

ing her desire to avoid the payment of tuition. We say this because, in these conversations, she probably based her contention on the fact that the boys were residing with her and making her place their home; but it is not within the limits of probability that she gave to these strangers a detailed statement of the conditions and circumstances under which she had taken them into her home; that she detailed to them conversations which neither she nor her brother Joe repeated to any other living soul. We must find that she did this before we can accept their testimony.

This estate is a very large one, and was at the time it is claimed this contract was made. She had one sister, at least, with whom she had resided for ten years after her husband's death; another sister with whom she was on most intimate and sisterly terms. She had nieces and nephews for whom,- this record discloses, she entertained a kindly feeling. This record bears us out in saying that these witnesses had been talked with before ever they went upon the stand,—talked to by parties who were interested in securing to themselves this entire estate, interested in securing evidence upon which to build a claim to the entire estate,— by those who knew what was necessary to sustain the claim. With a slight foundation of actual fact, we believe that these witnesses were led into thinking that they remembered the conversations as detailed; this, through the influence of oft-repeated suggestion.

We might not be justified in saying this if it were not for the testimony of Mrs. Mallon. Mrs. Mallon resided at Joe's house after his first wife's death. She was there at about the time the boys were taken by Mrs. Parriott. She testified:

"When I was at the Soldiers' Home, Joe and Jimmie came down to see me. They said they wanted me to come up and tell that I heard Mrs. Parriott say she would leave what she had to these children. They wanted me to come

and gave me great inducements to come. I told them I couldn't come. They told me to come up there, told me where they lived, and told me that I wouldn't be at any loss to come up. I told them I was coming up anyway, and they wanted me to come and see them. I did come up. I told them she was gone now, and that I couldn't say that; that I never heard her say it. They wanted me to say things that I couldn't say, and that I didn't hear her say, and that was, that she was going to leave the children her property."

This discussion has proceeded far enough. After a careful reading of this record, we are satisfied that the judge before whom the case was tried, who had an opportunity to hear and see the witnesses, to observe their manner of testifying, who had all those aids that come to a trial judge that are not given to us, did not err in dismissing plaintiff's petition; and the action is, therefore,— *Affirmed.*

LADD, WEAVER, PRESTON and SALINGER, JJ., concur.

EVANS, J., took no part.