OLIVE L. DANIELS et al., Appellees, v. PHEBE BUTLER et al.,
Appellees, and ERNEST LEWIS, Defendant, Appellant.

**APPEAL AND ERROR:** Perfecting Appeal—Notice on Nominal
1 Party—When Not Necessary. Notice of appeal need not neces-
sarily be served on every person who, on the face of the record,
is a party to the action. (Sec. 4114, Sup. Code, 1913.)

PRINCIPLE APPLIED: Action for partition. A party inter-
vened alleging that he had a judgment against two of the defend-
ants, a husband and wife, but that a discrepancy existed in the
names of the defendants as they appeared in the judgment. In-
tervener asked that the judgment be reformed so as to correctly
state the names and that the judgment be declared a lien on the
defendants' interest. One defendant (appellant on appeal)
denied this petition. No notice of the intervention was served
on other parties and no one else appeared or pleaded thereto. In-
tervener on the trial introduced neither judgment nor evidence on
his claim. The decree ignored the intervention, neither granting
nor denying intervener any relief. Intervener did not appeal.
*Held,* notice of appeal need not be served on intervener.

**APPEAL AND ERROR:** Preserving Evidence—Copying Certificate
2 to Notes—Reversing Title—Effect. That the evidence has not
been properly preserved cannot be predicated on a mere clerical
error of the official shorthand reporter which misleads no one.

PRINCIPLE APPLIED: A certificate of the judge and re-
porter, under the correct title of the cause, was properly attached
to the ''notes'' at the close of the trial and proper filing was
made. The reporter in making his translation copied this cer-
tificate showing the correct number of the case but inadvertently
*reversed* the names of plaintiff and defendant in the certificate.
The *volume* of the transcript in which this certificate was incor-
rectly copied correctly gave the title of the cause. The certificate
of the reporter to the translation correctly titled the cause. *Held,*
error was harmless.

**APPEAL AND ERROR:** Equitable Action—Transcript—By Whom
3 Certified. The reporter alone need certify to the transcript of the
evidence in an equitable action.

**APPEAL AND ERROR:** Transcript of Evidence—Division into Sev-
4 eral Volumes—Certificate to One Volume Only. The certificate
of the shorthand reporter to the transcript of his ''notes'' need

not be attached to each and every part of such transcript into which it may be divided for convenience in handling.

PRINCIPLE APPLIED: The "notes" were properly certified to by the judge and reporter and timely filing made. In preparing transcript of the testimony the pages were consecutively numbered from 1 to 443. For convenience the reporter divided this into four volumes. He also prepared volume 5, composed wholly of exhibits referred to and identified in the preceding four volumes. His certificate, full and comprehensive, made no specific reference to the several volumes, and was attached to volume 4 only. *Held*, sufficient.

ADOPTION: Contract for—Degree of Proof—Equity—Specific Performance. An estate may be disposed of by contract, oral or written. Such contracts usually take the form of contracts of adoption insufficient to meet the formalities of statutory adoption yet enforceable in equity. To establish such a contract a mere preponderance of evidence is not sufficient. Evidence reviewed and *held* not to establish the contract alleged.

EVIDENCE: Letters to Adversary—Secondary Evidence of—Notice to Produce. "Notice to produce" is essential to the introduction of secondary evidence of the contents of letters written and sent to the ancestor under whom the party against whom the secondary evidence is offered claims.

CONTRACTS: Contract to Will and Bequeath—Evidence—Sufficiency. Evidence reviewed and held sufficient to establish a contract "to will and bequeath real estate."

EVIDENCE: Transactions with Deceased—What Is Not—Opinion on Handwriting. One incompetent to testify to a personal transaction with deceased may be perfectly competent to give his opinion as to the handwriting of deceased. (Sec. 4604, Code.)

*Appeal from Taylor District Court.*—HON. THOMAS L. MAXWELL, Judge.

THURSDAY, NOVEMBER 5, 1914.

REHEARING DENIED MONDAY, FEBRUARY 15, 1915.

ACTION in equity for partition of land. Defendant, Ernest Lewis, filed an answer and cross-petition, alleging that he had been adopted by deceased and was entitled to all the

property. He also claimed to be the owner of 420 of the 460 acres of land by virtue of certain written contracts, which contracts the other parties allege were forgeries. The trial court found against Lewis and dismissed his cross-petition, and he appeals. The facts are more fully stated in the opinion.— *Affirmed* in part, and *Reversed* in part.

*McCoun & Brant, G. B. Haddock* and *Parker, Parrish & Miller,* for Ernest Lewis, appellant.

*Crum, Jaqua & Crum, W. N. Jackson* and *Frank Wisdom,* for appellees.

PRESTON, J.—1. Appellees' motion to strike abstract and to dismiss the appeal will be first considered. One ground of the motion is that no notice of appeal was served upon J. F. Chiles, intervener, and it is claimed that

1. APPEAL AND
ERROR: per-
fecting ap-
peal: notice
on nominal
party: when
not necessary.

if the case is reversed he would be deprived of his lien without an opportunity to be heard in this court. In the petition of intervention, Chiles alleged that he had a judgment for forty-five and 68/100 dollars against defendant, R. B. Widner, and Amelia Widner, his wife. That his judgment as rendered was against them as Rose Widner and Mrs. Rose Widner; that Rose Widner and defendant, R. B. Widner, is one and the same person, and Mrs. Rose Widner and defendant Amelia Widner is the same person. The prayer is, that the judgment be reformed so as to correctly state their names, and that the judgment be declared a lien upon the interest of said defendants. Appellant Lewis denied the allegations of the intervener. At the trial, intervener did not introduce any evidence, nor did he introduce the judgment. No notice of the intervention was served on other parties, and they did not appear or plead thereto. The judgment was not reformed. No relief was granted or denied intervener. This matter is not referred to in the decree. If Chiles had a judgment, it would be a lien by operation of law, and it was not necessary

to intervene for that purpose. But, as stated, they asked a reformation, as well as the establishment·of the alleged lien. Intervener has not appealed from the failure of the court to grant him the relief asked. He seems to have abandoned his petition of intervention. Under such circumstances, so far as the contention between cross-petitioner Lewis and the heirs is concerned, it is the same as though he had not filed his petition, and his rights cannot be affected one way or the other by an affirmance or by a reversal of the case here. It does not appear that he has any rights or judgment or lien, because the allegations of his intervention were denied and he offered no proof.

2. It is contended by appellees that the evidence has not been properly preserved. The certificate of the judge and reporter was attached to the reporter's notes and filed in the

2. APPEAL AND ERROR; preserving evidence: copying certificate to notes: reversing title: effect.

clerk's office at the close of the trial. In copying this certificate in his translation of the notes, the title of the case was written in a printed form of certificate used as—Phebe Butler et al., Plaintiffs, v. Olive L. Daniels, et al. It should have read—Olive L. Daniels et al., Plaintiffs, v. Phebe Butler et al. This was evidently a mistake by the reporter in copying. The title of the case was correctly given in the original certificate, and the volume of the transcript in which this certificate is erroneously copied correctly gives the title of the case. The correct number of the case is 7559, and this number appears in the title in which the reporter erroneously reversed the names in copying in the transcript the certificate to the shorthand notes.

3. APPEAL AND ERROR: equitable action: transcript: by whom certified.

The transcript made by the reporter was, within the proper time, certified by him, but not by the judge. It was not necessary that the judge sign such certificate. *Merrill v. Bowe*, 69 Iowa 653.

The amendment to Sec. 3652 of the Code makes no change in respect to this. In this certificate of the reporter, he certifies that:

"By direction of the court, I made the official report of Olive L. Daniels v. Phebe Butler et al., tried at said term aforesaid, the Hon. Thomas L. Maxwell being the sole presiding Judge; that I made the official report of said case in accordance with Sec. 3675 of the Code of Iowa, and that said official report, with the certificate of the trial Judge and official reporter, was filed with the Clerk of said Court, attached to the shorthand notes, on December 21, 1912.

"I further certify that the within and foregoing is a full true and complete extension of the evidence offered, adduced or introduced upon the trial of said cause; that it contains a full, true and complete extension of all agreements, as well as all objections to the testimony, the rulings of the court upon the same, and the exceptions at the time taken and preserved by counsel; that it fully identifies all exhibits offered, adduced or introduced upon said trial, and that, together with the exhibits therein referred to and identified, constitutes all the evidence offered, adduced or introduced upon the trial of said cause, and constitutes the official transcript of the testimony therein."

This is dated and signed by the reporter. The title of the case is correctly given in this certificate. The mistake of the reporter in copying the certificate in the transcript is clearly a clerical error and could not have misled anyone. The volume of the transcript itself purports to be evidence used in the trial of this case.

Another ground of the motion is that the certificate as to the evidence was attached to only one volume of the longhand extension of the reporter's notes, while the evidence as thus extended was contained in five such volumes of transcript. It seems that, for convenience of handling the transcript of evidence, it was divided into five volumes. Volume 5 consists of exhibits offered during the trial. The other four volumes begin with page 1 and are consecutively numbered through said four

4. APPEAL AND ERROR: transcript of evidence: division into several volumes: certificate to one volume only.

volumes, ending with page 443 as the last page in Volume 4.
The certificate of the reporter is attached to said Volume 4,
instead of being attached to each volume and to the volume
of exhibits. The title of the case is correctly given at the
beginning of Volume 1 and also in the certificate at the end
of Volume 4. As before stated, the shorthand notes were
properly certified to by the judge and reporter, and the tran-
script is properly certified to by the reporter. It is a matter
now of identification of the evidence after a proper certifica-
tion. In our opinion, this was sufficiently done in this case
under the statute. We are of opinion that it was not neces-
sary to attach a certificate to each volume. Volume 5, as
stated, consisted of the exhibits offered on the trial, which.
were properly identified by the reporter and referred to in
the first four volumes. This being so, it was not necessary,
although perhaps it would have been better practice, to
put the certificate at the end of Volume 5. We think the
motion should be, and it is, overruled.

4. The defendant, Ernest Lewis, by his answer and cross-
petition, alleges, substantially, that he is the owner of the
real estate in question as the adopted son of deceased, A. J.

5. ADOPTION:     Litteer, pursuant to a contract of adoption
contract for:
degree of        between his parents and said Litteer, whereby
proof: equity:   Litteer bound himself to leave his estate to
specific per-
formance.        Lewis as sole heir. It is not claimed that
there was a completed, formal adoption, but the claim is that
such a contract was made in parol and by correspondence.
In other counts of the answer and cross-petition, he claims to
be the owner of 420 acres of the land in controversy under
the terms and conditions of two written instruments declared
upon by him and known in the records as Exhibits One and
Two. He alleges that he has performed his part of such
agreements.

The questions presented are very largely, indeed, almost
entirely, of fact. Many witnesses were examined, and the
abstract is voluminous; elaborate arguments have been made,

and the case has been carefully and ably presented. It will be impractical to review the evidence in detail. We shall attempt to briefly state the evidence, or the more important points, and our conclusions. It does not follow that, because the evidence is not set out more in detail, it has not all been considered. The case involves a considerable amount of property and is of importance to the litigants. The record has been read and studied with the care required in such a case.

First, as to the alleged contract of adoption. That such a contract as alleged may be enforced if the evidence is sufficient under the rule in such cases has been decided in *Stiles v. Breed*, 151 Iowa 86, 91; *Chehak v. Battles*, 133 Iowa 107, 117.

The rule as to the quality and quantity of proof required is stated in the *Stiles* case. Some of the cases say that the terms and character of such a contract must be established by evidence so clear and forcible as to leave no reasonable doubt in the mind of the Chancellor. We apprehend this does not mean beyond all reasonable doubt as in a criminal case. A mere preponderance of the evidence is not enough, but it must be so clear and satisfactory as to convince the mind. As some of the cases put it, under similar circumstances, where one of the parties is dead and unable to give his version of the matter, and the heirs are necessarily limited to collateral facts and circumstances and to matters affecting the credibility of the witnesses, we are not compelled to believe a witness simply because he testifies to the contract, but that such testimony, often given by interested witnesses, should be closely scanned, and must be tested by its own inherent probability or improbability, and by ordinary rules of human conduct under similar circumstances. We are not intending to relax the rule.

Before going into the evidence as to the alleged contract of adoption, it may not be out of place to refer to the situation in a general way and the relations between Lewis, and deceased and his wife. Some of these circumstances have a

bearing, also, upon the other branch of the case in regard to
the written contracts, Exhibits One and Two. It appears
that defendant Lewis left the home of his parents in Kansas
in 1891, when he was sixteen years of age, and came to the
home of deceased, whose wife was an aunt of Lewis. Litteer
and wife were childless. Before this they had taken other
children to raise and educate, but such children did not suit
Litteer and they had left his home. After Lewis came he
went to school, did chores, made garden, and the like. Later,
he taught school some months, still making his home at Lit-
teer's. In 1901, when Lewis was twenty-six years of age, he
was married and moved on the 420 acre farm now in dispute
and remained on the farm, under different arrangements,
until the death of Litteer. Deceased was pleased with Lewis;
appeared to have confidence in him. Their relations were
friendly, except that there is some claim that some years be-
fore Litteer's death there was some disagreement as to the
settlement of the partnership which existed between them
part of the time Lewis occupied the farm. But it is not
claimed that there was any serious difficulty at this time.
Lewis continued to occupy the farm, and the relations between
them were friendly. Lewis occupied the farm some of these
years under verbal leases; some years there were written
leases, others, a partnership; and at the last, as Lewis now
claims, under the written contracts One and Two later re-
ferred to.

A. J. Litteer, aged about eighty-two, died about January
20, 1912, seized in fee simple of the real estate described in
the pleadings. His wife died about a month before, or on
December 18, 1911. He left no will which has been discovered,
although there is some claim in the testimony that he said he
had made a will. He left surviving him one sister, Phoebe
Butler, and a number of nieces and nephews as his only heirs,
who are all parties to this suit, either as plaintiffs or defend-
ants. The day before his death he conveyed his homestead
property in Bedford, consisting of seven acres of land, to his

nephew, John Widner. At the time of his death he owned 240 acres of land in Kansas, in addition to the 460 acres described in the petition. A partition suit was brought in Kansas and the 240 acres of land there were ordered sold in 1912, but the funds remain in the hands of the court. Deceased left notes in the sum of about $7,000.00, which were in the possession of Lewis, and not indorsed; the administrator secured an order for the examination of Lewis for the purpose of discovering assets. The scope of that examination extended, perhaps, beyond the contemplation of the statute, and inquiry was made of him in regard to the real estate and his relations with deceased. Some of the statements then made are alleged by appellees to be contradictory to the testimony and claim now made by Lewis, and inconsistent with his present claim.

Appellant's claim is that the adoption contract was made about the time he came to the Litteer home in 1891. The father of Lewis testifies that he went from Kansas to Bedford in response to a letter from Litteer, suggesting that he rent the Iowa farm. The father did not rent the farm because, as he says, when he arrived at Litteer's home, Litteer's main object was to get one of Lewis's boys to adopt.

The trial court, in a written opinion, found that the alleged contract of adoption had not been established by the requisite amount of proof, saying:

"The only witness who attempts to testify to the agreement, and the person with whom it is claimed the agreement was made, is the witness, Henry Lewis, the father of cross-petitioner, Ernest Lewis. His testimony is presented by deposition. His testimony, as presented, is, that there was some talk between him and A. J. Litteer in August, 1891, in regard to the boy, Ernest Lewis, who had, without consent of his parents, left his home in Kansas and gone to his uncle and aunt, the Litteers. The witness says it was agreed that the Litteers should have Ernest and adopt him as their own child and leave him all their property. It is shown, however, at the time his

deposition was taken he was very old, his memory must have been more or less enfeebled, and it further appears that at the time the alleged agreement was made the witness was so deaf that it was almost impossible to carry on a conversation with him. He says that when he was at his sister's house in 1891, and the conversation occurred in regard to the adoption of the boy, that he was without his ear trumpet and used his sister's, Mrs. Litteer's, who, he says, was still deafer than himself. We have no doubt from the evidence that the Litteers desired to have the boy, Ernest, live with them, and they were glad and willing to furnish him a home, send him to school and care for him, as they did do; but I am not satisfied from the evidence that they ever intended, or that they ever agreed, to adopt him and make him their heir. . . . In fact, his own conduct, as well as the conduct of the Litteers, has been inconsistent with such an understanding or agreement."

We agree in the main with the trial court as to the testimony of Henry Lewis. There are some other circumstances on the cross-examination tending to weaken his testimony, which the trial court did not refer to. Neither shall we refer to all such circumstances.

He testified that his son Ernest was close to twenty years old at the time of the alleged adoption; that Ernest was sixteen years old when he left his father's house, but the witness says to the best of his knowledge it was in 1891 that he had the talk with Litteer. He says they had but one talk about it. The witness says he has no recollection about when he moved to Iowa, which, according to the testimony of other witnesses, was in 1896. He says that his sister, Mrs. Litteer, was so deaf he could not talk to her, and her voice was so weak he could not hear it. He was eighty-five years of age at the time he testified. He testified further:

"I never told anybody, I never told a soul; I don't publish my family to the world, that you must understand. I

was raised a Quaker and, by Jesus Christ, I am honest. I
get excited sometimes. I have a pretty excitable temper.
When I was young I wouldn't allow no man to doubt my
word.''

We cannot quite agree with the trial court in the state-
ment that Henry Lewis is the only one who attempts to tes-
tify to the agreement, etc. We think there is other evidence
on the subject and will now briefly refer to it.

Perhaps we should state a little more fully the evidence
of Henry Lewis before referring to the other evidence. He
testified further that Litteer was at his home in Kansas in
1899 and talked about the matter of adoption; that in August,
1891, in response to a letter from Litteer, suggesting that
Lewis should rent the farm in Iowa, Lewis visited the Litteers
in Iowa, but did not rent the farm, saying that when he got
to Iowa he found ''Litteer's object was to get one of my
boys to adopt. He didn't seem to want to rent me the farm.
At that time Litteer made a proposition if I would let him
adopt Ernest he would give him a good education and at
their death would leave him everything they had.'' That he
told Litteer he considered the proposition all right, if his wife
was willing, and that it was a part of the agreement that
he should get his wife's consent; that when he got back home
he stated the proposition to his wife, who said it was all right.
He testifies further:

''My wife wrote Litteer that she was satisfied with what
I had done. We got a reply to that letter. I do not know
where it is. I made a search for it, but could not find it.
Mr. Litteer's reply was that he was satisfied with the agree-
ment I had made with him. The letter said that she (Mrs.
Litteer) was satisfied with the agreement made. He (Lit-
teer) was not much of a writer, and she (Mrs. Litteer) done
all the writing, and probably he told her to write, and I ex-
pect she wrote it.''

In 1896, this witness moved to Taylor County, and says that, "Litteer said he did not want me to advise Ernest in any way. He considered him his boy and if he had to have advice he would give it." That after this agreement with Litteer witness never bought clothes or books or paid any expense for Ernest Lewis.

As to these alleged letters, no notice to produce was served as to those claimed to have been written to Litteer, and as to these and some of the others there was no sufficient foundation laid to permit secondary evidence. The evidence was all objected to by proper and timely objection, and this is true as to the competency of witnesses under Sec. 4604 of the statute.

6. EVIDENCE: letters to adversary: secondary evidence of: notice to produce.

Mrs. Lewis, the mother of appellant, testifies that prior to 1891 Litteer and his wife visited them in Kansas three or four times; that there was always some talk about them adopting a child; that her husband, Henry Lewis, visited Bedford, Iowa, during August, 1891; that upon his return he stated that an agreement had been made with Litteer that he was to have one of the boys. She says:

"My son John and my daughter Ida stayed at Litteer's one year and went to school. They provided for them while they were there and sent them to school and furnished all things necessary, and it was after that that they wanted John to come and stay with them. It was about 1890. The circumstance of my son Ernie leaving home in 1891 was that he just went. That was the circumstance. I did not have any knowledge at that time when he went."

She also says that after 1891 Ernest remained at the Litteer home and that nothing was collected for Ernest's services while he was at Litteer's; says while they lived on the farm in Iowa she heard Mr. Litteer tell her husband that Ernest was his boy now and he didn't need to give Ernest

any orders. She also testifies substantially as her husband in regard to the letters. Her evidence, taken all together, is indefinite and does not, we think, clearly and specifically refer to the adoption of Ernest.

Appellant himself testified in regard to the conversation between Litteer and Henry Lewis, but we are not satisfied from the record that he did not take part in the conversation, and we think he was incompetent as a witness as to much of his testimony.

Meek testifies that when the boy, Ernest Lewis, would come into Meek's store after school, Litteer remarked on different occasions, in substance:

"Well, Alex, I have got a boy and I have a notion to adopt him. Mr. Litteer told me he had wrote to Mr. Lewis (Sr.) to come out here and he would try to rent him his farm, but that Litteer said, 'Really what I want him to come out here for is for the purpose of getting his consent to adopt this boy.' "

That at Mr. Litteer's house, in the presence of Lewis, Sr., Litteer said to the witness:

"Alex, Mr. Lewis and I are going to make a deal. I am going to take this boy and keep him, provided his wife gives her consent. Now that is about all I remember of being said."

Meek further testifies that Litteer's mail and his own came in the same post-office box; that he personally knows that about two weeks after Lewis, Sr., went home, a letter came from Kansas addressed to Mrs. Litteer; that Mr. Litteer went back to the desk in Meek's store and got the letter and walked up to the bench where Meek was at work, saying:

"Well, Alex, I have got an answer to the proposition that I made to Mr. and Mrs. Lewis concerning the boy. It is in this letter. The answer is all right. Mr. Litteer told me

frequently that they intended to adopt Ernie as their son.
After he had closed this deal in Kansas Mr. Litteer always
in my presence called him his boy.''

He also says that in August, 1911, he and Litteer had
the following conversation:

"I asked him at that time why it was he had never went
on and completed the adoption of Ernest Lewis, and he told
me that it had just been neglected carelessly, but he thought
the thing was just as well as though he had had the adoption
papers made out.''

The witness is contradicted to some extent by the admin-
istrator. He admits a conversation with the administrator,
and says he did not tell the administrator, in response to his
questions, about the things he had testified to because Litteer
on his death bed had made witness a present of a horse and
buggy, and that some of the heirs objected to his having it,
and the administrator also, and that they tried to bully him
and that he got riled up about it. He admits his memory is
somewhat defective.

A part of the testimony of this witness indicates a fu-
ture purpose to adopt, and is possibly consistent with the
theory of adoption, yet it is equally consistent with the theory
that Litteer was going to help appellant without adoption
and compensate him by gift or in some other way. Some of
these conversations in which the witness claims Litteer said
he was going to adopt were after the time when the alleged
contract of adoption was made.

Witness Harvey testified that Litteer had made him a
loan of money, and that Litteer said, in the presence of ap-
pellant, in regard to the interest, that he (Litteer) might
die before three years, and that if he was not here at the end
of that time Lewis would look after it. That in the conversa-
tion he eulogized Lewis; said he considered him his own boy,
and that if anything happened the note could be paid to

Lewis; and in another conversation Litteer said that Lewis could attend to insurance on the barn; that it would fall to Lewis anyway. The first of these conversations was in June, 1911.

Witness Osborn testified as to a conversation with Litteer in December, 1910, in which Litteer said that he had taken Lewis to do what was right by him; that after Lewis graduated he had taught school and married, and that then he had put Lewis out on his farm; that he had educated three or four other children, and that Ernest Lewis was the only one that ever stayed by him; that he had told Lewis that he wanted him to do what was fair and straight there and he would give the farm to Ernest Lewis, and said: "In fact, I have a contract to that effect." This was after the execution of Exhibits One and Two, and could, and probably did, refer to the contract rather than to adoption. This witness also testifies that Litteer never referred to Lewis as his boy to him.

Lacey testifies that Litteer told him: "I am giving that boy a good chance; that boy has been in the family, adapted to the family.

Q. "Adapted?"

A. "Yes."

Says also that in a conversation in July, 1911, Litteer said that Lewis was going to stay on the place and rent the farm, and eventually he thought Lewis would get the proceeds of the farm.

Hough testified to conversations between himself and Litteer, in which the latter said, referring to Lewis, that he (Litteer) thought it would be better to leave the management of the farm to the boy; that he would have to learn, and he might as well learn one time as another; that at one time Litteer asked witness, "How is my boy getting along up on the place?"

Hanshaw testifies to a conversation in 1910 on the Litteer farm, in which Litteer said:

"Ernest has been with me and helped to make money in his deals. He has been with me a long while, and when I am done with this property I have here I intend to see that he loses nothing by it."

Alfred Lewis, a brother of appellant, testifies to hearing his father and mother discussing the question of the adoption of appellant by Litteer. This was not in the presence of Litteer. The witness says:

"I have heard A. J. Litteer say that he had adopted Ernest as his son and considered him as such, and that he should have his property; have heard him say that my father and mother consented to the adoption."

Ida Carver, a sister of appellant, gave similar evidence as to conversations between the father and mother of appellant after the father's return from Litteer's in 1891. That Litteer often asked the witness what she thought of his boy, referring to Ernest, and that he always seemed to take a great interest in him.

Some of the heirs, as witnesses, testified to statements by deceased, but we think they were incompetent to testify. Testimony was offered by appellees tending to show conduct and statements of some of appellant's witnesses somewhat inconsistent with their evidence. We shall refer to some of the circumstances tending, we think, to show that the conduct of appellant has been inconsistent with his present claim as to the adoption.

In his answer first filed he relied on the written contracts, One and Two, hereafter discussed, but did not plead the adoption. He explains this by saying that his attorneys who were then managing his case advised him that he did not have sufficient evidence to establish that claim. There are some matters in connection with this which make the explanation unsatisfactory. Appellant had knowledge of the partition proceedings in Kansas for the sale of the Kansas land

soon after the death of Litteer, but made no objection thereto. The Kansas land consisted of 240 acres, of the value of about $50.00 per acre.

The contents of Exhibits One and Two, hereafter set out, seem to negative the idea of adoption, while there is one clause therein which by itself might be said to corroborate to some extent that theory. This is the reference in the contracts to the Litteers' considering him their son, but these contracts are not of themselves sufficient as an adoption and are not so claimed by counsel. The contracts are specific as to the 420 acre farm. This bears out the theory that, though deceased may have had the notion at times of formally adopting appellant in legal form, he did not do so, and that he expected to "do what was right by Lewis," as he stated to some of the witnesses, but that this was to be done in his own and in some other way than by adoption.

There are other circumstances in the record not detailed, but we have intended to refer to the substance of the more important testimony. While it must be admitted that the evidence tends to show that there was a contract of adoption, yet, taking into consideration the nature of the case, the fact that Litteer is dead, and the difficulty for the heirs to meet by affirmative proof the evidence on behalf of appellant, and considering all the facts and circumstances in the case, we conclude that appellant has not established his claim at this point by that clear and convincing proof required under the rule in such cases.

5. Appellant contends that, regardless of the rights of the cross-petitioner, under the alleged agreement to adopt, he is entitled, under the contracts, Exhibits One and Two, to the relief sought as to the 420 acre farm of which Litteer died seized. Exhibit One, which has been referred to, which appellant claims and we find he has performed on his part, is as follows:

7. CONTRACT: contract to will and bequeath: evidence: sufficiency.

"Conway, Iowa, September 16th, 1910.

"Contract and Article of Agreement, between A. J. Litteer and Mary L. Litteer parties of the first part and Ernest Lewis party of the second part, agree and enter into the following: We, A. J. Litteer and wife, parties of the first part agree to give, will and bequeath at the death of the last one of us living our farm of 420 acres known as the A. J. Litteer farm one and one-half miles South of Conway, 260 acres being in Clayton Township and 160 acres being in Marshall Township, Taylor County, Iowa, to said party of the second part Ernest Lewis our nephew, we considering said second party an heir as though he were our son by blood and birth, farm to be as described according to Plat Book of Taylor County, Iowa. For and in consideration of which the said second party agrees to pay an allowance of Twelve Hundred Dollars per year to said first parties during their lifetime or the lifetime of either of them. The said second party further agrees to take same care of said first parties should they or either of them become enfeebled in mind or body as though they were his own parents by blood. This contract to be in full effect from date. Parties of the first part: A. J. Litteer, Mary L. Litteer; Second Party: Ernest Lewis. Witnesses: Claude Johnston. J. B. Dant."

Exhibit Two, which appellant contends is supplemental to Exhibit One, is like it, except that the land is particularly described. It is dated September 24, 1910, and the only purpose seems to have been to give a description of the land.

Appellees question the genuineness of the signatures to both these instruments. The substance of the finding of the trial court as to these contracts is:

"It must be and it is conceded that if A. J. Litteer executed these writings, Exhibits One and Two, then the cross-petitioner is entitled to the 420 acres in question. Unfortunately for the cross-petitioner, the facts and circum-

stances shown by the evidence, and the conduct of both the deceased and the cross-petitioner, from and after the date of these instruments up to the death of deceased, are inconsistent with the claim now made by cross-petitioner. This very important document, Exhibit Two, is claimed to have been made as an instrument of final and permanent character. But the fact that it was made without the presence of any person is a circumstance within itself that makes it look unusual and peculiar. . . . It is claimed that at the time Exhibit Two was executed a duplicate copy of the same was executed, and that was left with the deceased. The history of his business life indicates that all of his important papers were found among his papers or effects. The genuineness of the signature attached to said instrument is disputed, and certain expert witnesses called pronounced it spurious. The cross-petitioner also offered an expert upon handwriting who gives it as his opinion that the signature is genuine. I have become satisfied that the name attached to Exhibit Two is not the genuine signature of A. J. Litteer. As to the genuineness of the signature to the document, Exhibit One, I am not as well satisfied, but, in the light of all the evidence, I have reached the conclusion that neither of these documents are genuine. It would serve no good purpose to point out the various facts and circumstances shown by the evidence, which lead me, most reluctantly, I admit, to this conclusion.''

The court seems not to have been entirely satisfied that Exhibit One is not genuine. Appellees have the burden as to the question of forgery. The evidence is directed more to Exhibit One, as are the arguments, doubtless on the theory that it is the key to or basis of, the other, and if that is found to be a forgery it would be more probable that Exhibit Two is not genuine. If Exhibit One is genuine, it is not improbable that Two is also genuine because the only purpose of Two is to give a technical description of the 420 acres, and if One is genuine the only object in the making of Two would be

to carry out the plan of the deceased. There is not as much evidence tending to show that Two is spurious or to sustain its genuineness as there is to the first writing. It appears to us there was no real necessity for Exhibit Two. The description of the land in Exhibit One is such that it could be made certain and was sufficient in itself without the other writing.

As to the papers of deceased, the property in which Litteer died had been deeded by him to one of the heirs, and after Litteer's death was in control of some of them. The administrator was not appointed for three or four days. There were meetings of the heirs in this property; others had access to the papers. Lewis was present part of the time, but not always, when the papers were being examined. It appears that there were, as one witness puts it, two or three bushels of old papers, and they were examined and some thrown on the floor.

Widner, one of the appellees, claims that deceased told him, some time before his death, that he had some papers put away in the ground in the garden in a stone churn. A search was made by the administrator and others for this churn, but it was not discovered.

We shall take up first the evidence as to Exhibit One. As to this, as on the question of adoption, we shall treat the matter as best we may without going fully into details. Exhibits One and Two, with other writings containing admitted signatures of Litteer, and enlarged photographs of the different signatures, have been certified. After a careful comparison and a study of the signatures, in connection with the testimony of the experts, the facts which corroborate the genuineness of the signatures, the circumstances shown which are claimed to be against that theory, the situation and relations of the parties, the probability that Litteer desired to make some such arrangement, and after a careful examination of all the facts and circumstances shown, we conclude that appellees have not sustained their claims that Exhibits One and

Two are forgeries. To our mind, appellant has clearly a pre-ponderance of the evidence on this issue.

Appellees contend that the circumstances under which Exhibit One is alleged to have been executed tend to show that it is spurious. It is said that some of the statements of appellant given on his examination in the probate proceeding for the discovery of assets are inconsistent with his present claim, but we think such statements are, in the main, entirely consistent. That entire examination is before us. It was an examination under Sec. 3315. of the Code, we take it, for the discovery of assets, and for an order of court to turn them over to the administrator if it appeared that they were wrong-fully held. The real estate was not involved in that proceed-ing, but it was inquired about. The examination was very searching. One circumstance of the alleged inconsistencies therein will suffice to illustrate appellees' claim as to this mat-ter. Appellant testified that he wrote the body of Exhibit One at the dictation of Litteer and that he saw Litteer sign it. The witness was not competent to testify to such signing, and his evidence is not considered. It is referred to in con-nection with statements made by him in the probate examina-tion which appellees claim are inconsistent with his present claim. During that examination, Lewis stated that the Lit-teers had promised to give him the 420 acre farm where he lived, and was questioned further as follows:

Q. "Did he give a deed for it?"
A. "No, sir."
Q. "Who joined with him in the gift?"
A. "His wife."
Q. "Did they sign any papers?"
A. "They said they did."
Q. "Well, did they that you know of yourself?"
A. "I didn't see them sign them."

He testifies now that, "He (Litteer) was talking about deeds, and I was talking about deeds. He said that he had

made deeds and that I would find them in the house; for the 420 acres of land.'' Appellees claim that by this appellant referred to Exhibits One and Two and meant to say that he did not see such exhibits signed. It seems to us he was referring to deeds and not to the Exhibits One and Two.

Appellant's claim is that Exhibit One was prepared and signed in the barn on the farm in the forenoon; that deceased had come out to attend the sale. There was a sale held on the farm that afternoon. Preparations for the sale were going on before the sale. A few people had come to the sale before noon.

It is contended by appellees that the execution of such a contract under the circumstances shown is unusual and improbable. Some other circumstances of this character will be noticed in connection with the discussion of the evidence. Appellees rely on the foregoing and similar circumstances and the evidence of two experts on handwriting to establish their claim that the contracts are not genuine. Such is the substance of their claim. Conceding the honesty and competency of appellees' experts, they had never seen deceased; they had never seen him write; and before the trial they had but three genuine signatures of deceased for examination and comparison, and some of these were with pen and ink. The disputed signature to Exhibit One is in pencil. It is conceded that comparisons of ink and pencil signatures are unsatisfactory. The experts were paid good fees. The evidence of such experts is much like the evidence of an attorney in the case, more or less biased. This applies also to appellant's expert, who was at least of equal ability and credibility. He had a larger number of admitted signatures for comparison. It is settled that such evidence is of a low order. It is a significant fact, and a weak point in appellees' case, that they did not inquire of any of the heirs, several of whom testified on other points, as to the signature of Litteer, nor did they attack the genuineness by any bankers, business men or others who were

familiar with his signature.   Deceased had executed bank
checks, notes, deeds and other writings.

On the other hand, the record shows a reason for making
such a contract.   Deceased made his financial start with money
furnished by his wife; the appellant is the nephew of Mrs.
Litteer; the relations between Litteer and appellant were inti-
mate and friendly.   The evidence does not disclose that there
were any bonds of intimacy or friendship existing between
any of the plaintiffs and defendants and A. J. Litteer.
Deceased often expressed the desire and purpose of doing
something for appellant.

The genuineness of the signatures of Mary L. Litteer,
the wife of deceased, to Exhibits One and Two is established
by competent evidence.   That these are her genuine signa-
tures is nowhere and in no manner disputed in the record.
It is, perhaps, not so very material now as to her signature,
because she died before her husband, but she was interested
at the time she signed these exhibits.   The evidence tends to
show that they were signed by her after they bore the signa-
tures of her husband.   The fact that she signed these contracts
is to our minds a strong circumstance that Exhibits One and
Two are the genuine contracts and bear the genuine signatures
of A. J. Litteer.

8. EVIDENCE:
transactions
with deceased:
what is not:
opinion on
handwriting.

The appellant testifies that he had seen
Litteer sign his name a great many times and
was familiar with his signature, and he testi-
fies that in his opinion the signatures in ques-
tion are the genuine signatures.

It has been repeatedly held that he is not incompetent
under Sec. 4604 to give an opinion as to handwriting.

A. S. Meek testified that he had seen both Mr. and Mrs.
Litteer sign their names a great many times and was familiar
with their signatures, and gives his opinion that these signa-
tures are genuine.

J. R. Cooper, a banker, testified that he had seen the
signature of Litteer, and that checks had passed through his

bank on which his indorsement was necessary. He gave his opinion that his signatures to Exhibits One and Two are genuine.

Mr. Mechin, the expert for appellant, gives his opinion to the same effect.

J. B. Dant and Claude Johnston, who signed Exhibit One as witnesses, testified on the trial that they were present at the time Exhibit One was prepared and signed by Litteer; that they heard Litteer dictate the contract and witnessed its execution. They do not agree with each other in every detail as to just where the parties stood and as to just what was said and done, but they were asked to witness it. It is true they did not see Mrs. Litteer sign it, and they did not sign it as witnesses until some time after the transaction, and did so then at the request of the appellant. Lewis was advised by his attorneys, or some other person, to have these two persons sign as witnesses. These are circumstances proper to be considered on this question, but these witnesses are not otherwise impeached.

Exhibit One is written in a pocket account book.

Witness Wickersham corroborates the other witnesses, to some extent, as to the execution of Exhibit One. He testifies he was present at the sale on the date of this contract; that he saw Litteer and Mr. Lewis there, also Claude Johnston and Dant, but he is not quite clear that he saw them together in the barn with Litteer and Lewis; he saw Litteer and Lewis in the barn together. He did not pay much attention to what they were doing, but says Mr. Lewis had a book in one hand and a pencil in the other; that he was called away to attend to some of the stock, and that Litteer and Lewis were still in the barn when he went out of the barn door.

Hanshaw testifies that he was at the farm at the time of the sale on September 16, 1910; saw Mr. Litteer there about ten o'clock in the forenoon and talked with him before the sale; says he and Litteer sat down in the opening in the granary, and in the conversation Litteer said:

"Ernest has been with me a long while, and when I am done with this property I have here I intend to see that he loses nothing by it."

That while witness and Litteer were talking appellant came up there and witness noticed he had a day book in his hand, which witness describes as similar to the book in which Exhibit No. One is written; that when Lewis was standing there with the book in his hand Litteer says: "Let's go into the barn." That they got up and went in the barn; that this was about half an hour before dinner; that witness then went to see some other parties who had arrived; that he left Litteer and Lewis in the barn.

One of the appellees testifies to having been at the farm on the day of the sale, and says that Litteer was not there, at least witness did not see him. But the evidence is overwhelming that Litteer was there.

Appellees' witness Keith, who was at the sale on this date, testifies that while he was feeding the horses he saw Mr. Lewis and Mr. Litteer; they were then standing on the east side of the barn near the door. He did not notice them leaving there when dinner was announced; says he was busy and wasn't paying any attention to them. That he didn't notice any writing going on while they were standing there in the barn.

The evidence shows declarations and statements by Litteer that he had executed such contracts. These witnesses are Meek, Hanshaw, Osborn, Harvey and Lacey. These witnesses, and some of the others before mentioned, appear to be disinterested. Some of the testimony of these last named witnesses has been referred to in discussing the other branch of the case and will not be now again referred to.

Boyd testified that about a week after he was appointed administrator of Mrs. Litteer's estate, appellant came to his house and handed him the book containing Exhibit No. One and appellant referred to the contract therein; that the witness says that at that time it contained the signatures of Lit-

teer and his wife and appellant, that is, what purported to be their signatures. Witness says that he has seen the signatures of both Mr. and Mrs. Litteer, but he would not feel justified in saying that he knew them well enough to identify them.

Witness Cooper testifies that after the death of Litteer there was a controversy over a road which was proposed through the Litteer farm, and that he had a conversation with appellant in relation to the road. Lewis said that he wouldn't have the road go through there for a thousand dollars; that he didn't wish the road to go through, and when witness asked appellant why, Lewis said: "I will show you why," and he went into the vault and got a book and showed him the contract in reference to the land. It was Exhibit One. That at that time the names of Johnston and Dant were not attached, and witness asked Lewis if anybody saw that contract drawn up or saw Mr. Litteer sign it. Lewis said they did; that there were two parties, and witness advised him to have the men sign the contract as witnesses.

Witnesses, Mr. and Mrs. Wright, the father-in-law and mother-in-law of appellant, and Mrs. Lewis, his wife, also testified to seeing the contract, Exhibit One, soon after it was executed.

Some of the evidence before referred to in regard to Exhibit One applies also to Exhibit Two, and there is other evidence as to Exhibit Two, both for and against the genuineness of the signatures thereto. But, as before stated, the most determined attack seems to have been made on Exhibit One and the evidence of appellant is directed more to meeting the evidence as to that contract. There are other circumstances, both for and against the validity of these contracts, and as bearing upon the credibility of the different witnesses, and proper to be considered in weighing the evidence, but the opinion is already too long, and we shall not further discuss the testimony.

There is another exhibit, Number Four, in regard to notes

of the deceased, which appellant claims were signed by Litteer, directing appellant to get the notes and that they should be his. The genuineness of the signature to this is also challenged. The claim is that it was executed a few days before the death of Litteer. There is evidence to sustain this contract, and also evidence attacking its genuineness; but, as we understand the record, that matter is not an issue in this case, except as it may be involved in the question of adoption, and we shall not take the space to review the testimony or determine the genuineness of the signature to Exhibit Four. It appears that appellant gave his notes for the $1,200.00 annual allowance referred to in Exhibit One. We do not understand appellees to claim that this would not be a performance or payment. The administrator is now insisting upon the validity of these notes, and that they should be paid. If deceased was satisfied to take notes instead of the money in performance of the contract, the heirs may not complain.

Our conclusion is that Exhibits One and Two are valid, and that appellant is entitled to a decree as prayed for the 420 acres. To that extent, the decree below is reversed; in other respects, affirmed. Appellant may have a decree in this court or in the district court, as he may elect. The costs in this court will be apportioned and taxed one-half to appellees, and one-half to appellant.—*Reversed* in part and *Affirmed* in part.

LADD, C. J., EVANS and WEAVER, JJ., concur.