A. E. MINION, Appellee, v. CHARLES W. ADAMS, Administrator, et al., Appellants. (Two cases.)

SPECIFIC PERFORMANCE: Contracts Enforceable—Degree of
1  Proof. Principle recognized that the evidence necessary to justify specific performance must be clear, satisfactory and convincing, though not necessarily free from inconsistency. Evidence reviewed, and held to justify the relief prayed.

WITNESSES: Competency—Transactions with a Deceased—In-
2  ferred Facts. Counsel for plaintiff, in an action on an oral contract with a deceased person, may not render his client a competent witness as to the terms of such contract by the simple expedient of directing this client to detail the terms of such contract *but to suppress the name of the person with whom such contract was had,* when the deceased was the *only* person with whom the client could have had such a contract.

*Appeal from Humboldt District Court.*—D. F. COYLE, Judge.

THURSDAY, OCTOBER 18, 1917.

ACTION for specific performance and for injunction.

There was a decree for plaintiff in the first case and for the defendants in the second. The facts will be sufficiently stated in the opinion. Adams et al., defendants in the first case and plaintiffs in the second, appeal.—*Affirmed.*

*Kenyon, Kelleher & Price,* for appellants.

*Robert Healy* and *Lovrein & Lovrein,* for appellee.

PRESTON, J.—In the first case, plaintiff, Minion, brought his action in equity, asking that the executors of the estate of A. M. Adams, who survived his wife, M. L. Adams, specifically perform a parol contract alleged to have been entered into between said Minion, plaintiff, and M. L. Adams and A. M. Adams, a copartnership, engaged in the publication of the "Humboldt Independent," claiming that, by the terms of such contract, M. L. Adams and A. M. Adams agreed that, if Minion, the plaintiff, would remain in the employ of said partnership and the survivor thereof, in the printing and publishing business, as long as they continued the publication of the "Independent," then the printing plant, including the real estate and books of account, should become and be the property of the plaintiff. The second case was brought by the administrators, asking an injunction against Minion, restraining him from interfering with the administrators in their possession of the assets of the estate of A. M. Adams, and asking an accounting from Minion for the proceeds of the estate, which it is alleged he had converted to his own use, since the death of A. M. Adams.

1. SPECIFIC PER-FORMANCE: contracts enforceable: degree of proof.

By stipulation, the two cases were tried together, and are treated as one case on this appeal. For convenience, we shall refer to appellee, Minion, as plaintiff. In the first case, it was alleged, substantially, that, in February, 1903, M. L. Adams, for the partnership, made an oral contract

with plaintiff, by the terms of which, if plaintiff should continue in the employ of the copartnership, and the survivor thereof, as long as the survivor lived, he should have his living out of the business and should have all the property used in connection with the business when the copartnership, or the survivor, was through with it; and that plaintiff complied with the terms of his agreement. It was also alleged that, about June 2, 1909, A. M. Adams, the survivor. of the copartnership, orally agreed with the plaintiff that, in consideration of services performed, and of his continuing to stay with Adams until the death of said Adams, plaintiff should have a living from the business, and upon the death of A. M. Adams should have full ownership of the printing and publishing business; and that plaintiff has complied with the terms of said agreement. Plaintiff asked that the administrators be compelled to specifically perform said contract, by conveying to him the said described premises, including the real estate and personal property of the "Humboldt Independent." It is also alleged that, on the death of M. L. Adams, A. M. Adams, her sole legatee, took the interest of the said M. L. Adams and held the same in trust for said Minion. A. M. Adams, the survivor, died in January, 1915, and his wife some time before that.

Defendants denied that either the copartnership or the members thereof had, at the time of the alleged contract with M. L. Adams, in 1903, become the owner of all the property now claimed by plaintiff under the contract; denied the existence of the contracts; averred that Minion was an employe working for wages which were accepted by him in full compensation; denied that plaintiff ever had possession of the plant; and asserted that the contract was in contravention of the statute of frauds; that, by his conduct, admissions and statements for five months subsequent to the death of A. M. Adams, plaintiff estopped himself to assert any individual right or title in the property;

that plaintiff has converted to his own use approximately $2,000 belonging to the estate, and they ask an accounting; that the contract sued upon was without consideration, and the consideration was inadequate; that the pretended contract was unenforceable in equity on account of uncertainty.

Some time after the cases were tried and submitted, there was filed an amendment to plaintiff's reply, in which .it was alleged that an accounting had been had between plaintiff and the administrators. Appellant says that this last pleading is an estray, as it is not supported by any evidence in the record. The evidence is not sufficient for the court to make an accounting, and the trial court·so held, and continued that feature of the case until the subsequent term, for that purpose, and the decree did not adjudicate that question. By the decree, plaintiff was given the printing plant and the real estate used in connection therewith, subject to an encumbrance, and the second case was dismissed on the merits. In this second case, the administrators claimed that deceased, A. M. Adams, was the sole owner of the plant; that, subsequent to his death, the administrators took possession of the property and prepared an inventory and appraised the same; that they continued to employ plaintiff until June, 1915, at which time they discharged him; that on the next day Minion returned to the premises and forcibly took possession of the plant; and they asked an injunction restraining him from interfering with their possession as administrators. Minion's answer to this petition was that he became absolute owner of said premises by reason of the agreement before referred to. He denied that he was ever in the employ of the administrators; denied that the administrators were ever in possession of the property.

A brief statement of the facts may be helpful. A. M. Adams began the publication of the "Humboldt Independent" ·in the early '70's; the plant was run and owned by

him and his wife, M. L. Adams, as a copartnership; they ran the business without the help of employees until the late '70's, when they hired a boy to assist; in May, 1882, the Adamses apprenticed the appellee, then a boy of 14 years; plaintiff remained with them for a period of 33 years, and until the survivor of the Adamses died; the Adamses had no children, and they always referred to plaintiff as their boy or their son; plaintiff did the work of an apprentice at the plant; he did the chores at the Adams home and lived at their home until his marriage; Mrs. Adams, as long as plaintiff continued to live with them, mended his clothes and looked after his welfare, and he was always treated by the Adamses as a member of the family, and so designated by them, often being referred to as their only child; plaintiff referred to Mrs. Adams as mother; in 1890, plaintiff left the Adamses to work for another printer in Humboldt, but remained away only three or four weeks, and then returned to them, receiving an increase in wages; plaintiff was married soon after this; in 1903, after plaintiff had been with the Adamses for a period of 21 years, he resigned; prior to the date of his resignation, he had discussed with his family other openings in the same field, and, on the evening of the day of his resignation, he told his family of his action, and during the evening his resignation and where he would go were the topic of conversation; the talk was that he was going to get something better because he had a growing family; that same evening, Mrs. Adams came to the Minion home, and, according to the testimony of plaintiff's two children, began a discussion in regard to Minion's resigna- tion; plaintiff informed Mrs. Adams that he resigned be- cause of the needs of his family and because he could not continue on his salary, and that he had no future outlook with the "Independent;" Mrs. Adams then told him that he need not continue on the wage he was receiving if he could not get along on it, but that he would be given a liv-

ing, and if he would continue with them they would leave
the printing plant to him upon the death of the survivor;
and thereupon plaintiff consented to continue.

The plaintiff testified that he had such a contract, but
did not say that he had it with the Adamses; he did testify,
however, that he had such a contract with no one other than
the Adamses.  Proper objection was made as to the com-
petency of plaintiff as a witness and to his evidence, under
Section 4604 of the Code, but appellee contends that the
cross-examination was so broad that the objection was
waived.  At the time of the alleged agreement in 1903, plain-
tiff was receiving $12 per week, and at that time, Mrs. Folk,
plaintiff's daughter, was between 7 and 8 years of age, and
plaintiff's son was 11 years of age.  It is claimed by appel-
lants that the testimony of these children is of little or no
weight, because of their ages.  The daughter testifies that
she remembered and told of the transaction soon after it
occurred, because she was so tickled over it, to think that
Mrs. Adams thought enough of her father, and he enough
of her, to stay with them, and that they would give him the
office if he did.  In his testimony, plaintiff claimed that, sub-
sequent to the conversation he had with Mrs. Adams in
1903, there was a change in his connection with the paper,
and that from that time he assumed a different attitude
and responsibility in connection with the management of
the business.  He testifies, over objection, that additions to
the plant or business or equipment were to be paid out of
the earnings of the business, and that, after the death of
Mrs. Adams in 1909, the earnings of the business above the
living expenses of A. M. Adams were to be his.  As to the
property plaintiff was to have, the daughter testified that
he was to have the office and everything connected with it;
that is, that it would be his upon the death of the survivor.
The son puts it that the plant and everything should then
be the plaintiff's.  Plaintiff puts it that, upon the death of

the survivor of the partnership, the plant, including the building, the real estate, business, and everything connected with the printing outfit, were to be his, upon performance by him of his part of the contract.

The trial court stated in an opinion, and found, that, if the case depended upon the evidence of plaintiff and the two children, the evidence would not be sufficient, because of the tender years of the children, and because of the incompetency of the plaintiff as to at least a part of his evidence, and because of inconsistent statements and conduct of the plaintiff. The court stated, however, that plaintiff was a fair and candid witness. It is possible that the cross-examination at some points exceeded the direct examination, and that some of plaintiff's testimony should be considered. We agree with the trial court that the evidence of plaintiff and his children would not be sufficient, but there was other evidence, which will be referred to later.

It is urged by appellants that plaintiff 2. WITNESSES: competency: transactions with a deceased: inferred facts. was incompetent to testify to the alleged contract in 1903 and the one in 1909. Notwithstanding this, plaintiff testified fully, over objection, and his testimony, including the direct examination and cross-examination, covers about 100 pages of the abstract and additional abstract. Appellants in argument point out at considerable length inconsistencies in plaintiff's testimony, and say that the explanations thereof are not sufficient to overcome the inconsistencies. It occurs to us that plaintiff's evidence is either competent or not competent, and he is either competent or incompetent as a witness, and that we may not consider the alleged inconsistencies alone.

Appellee relies upon *McElhenney v. Hendricks*, 82 Iowa 657, *Campbell v. Collins*, 133 Iowa 152, and *Secor v. Siver*, 161 N. W. 769, to sustain his proposition that, because of the

form in which the questions were propounded to plaintiff, he is competent. Under the circumstances here shown, we think plaintiff was incompetent to testify to personal transactions and communications, except in so far as his cross-examination may have exceeded proper direct examination. The cases cited were where a witness was asked as to whose possession a paper was in at a certain time, and the like, and the rule announced was that a party is competent to testify to facts and circumstances from which the truth as to alleged transactions between such party and the deceased may be inferred, even where his direct testimony to such transaction may be excluded. But in the instant case, plaintiff, though by the form of the question he was not to name any parties with whom he had a contract, did in fact testify to the alleged contract between himself and the two Adamses. The contract as testified to could not have been made with any other person than the two Adamses. One question and answer will illustrate:

"Q. Now, Mr. Minion, without naming any parties with whom that contract was made, state to the court what, if any, contract was made between you and any person or persons, regarding the employment and the title of the property, in connection with the 'Humboldt Independent.' A. I was to manage and operate the 'Independent' and I was to receive my living, and to conduct the same as my own, and I was to do that until the death of the survivor of either Mr. or Mrs. Adams,—that is, A. M. Adams and M. L. Adams,—and that, upon the death of the last surviving member, the plant, including the building and real estate and business and everything connected with the publishing outfit, was to be mine, clear and free,"—and so on, at great length.

To hold that, under such circumstances, a person may give the details of a contract involving personal transactions and communications with deceased persons, would be

simply to nullify the statute. It should be said that plaintiff testified on other subjects than those involving personal transactions and communications with deceased, and, of course, as to such he was a competent witness. There is no dispute between counsel as to the rule in regard to the quality and quantity of proof required in such cases. The cases are, substantially, that the evidence must be clear, satisfactory, and convincing, such as to convince the mind of the chancellor. It does not mean that the evidence must be entirely free from inconsistencies or that the case must be established beyond all controversy. It is not to be denied that there are some inconsistencies in the statements and conduct of the plaintiff. He failed to make any claim, such as he now makes, for a period of nearly five months after the death of A. M. Adams; he took part in the appraisement of the property as the property of the Adams estate; he asked the administrator whether he desired him to stay after the decease of A. M. Adams; he made and filed an affidavit with the post-office department, as to the estate's ownership of the property, and he attempted to buy the property.

His explanation of these matters is that he had understood, and had been told, that a parol contract such as this could not be enforced, and that he did not know his rights until he consulted attorneys, about the time the suit was brought. That is precisely the claim that defendants are now making in this case, and insisting upon it. The evidence is, too, that plaintiff expected deceased to vest the title in him by will, and that he and others were looking for a will among the papers of deceased, A. M. Adams. Mrs. Adams did make a will, which was duly probated, by which she gave all the property to her husband. It should have been said that we think the case presents, and must be determined upon, fact questions very largely, although appellants contend that the law questions are controlling. As

to the affidavit filed with the post-office department, he says he could not make such affidavit in any other way, because the legal title was in the estate.

Going now to the other testimony, we shall attempt to state our conclusions in regard to it in a general way, without going into details, since, as we have often said, it is not practicable to go into the evidence in detail in fact cases. There were fourteen witnesses, outside of plaintiff and his two children. Four of these testify directly to statements by deceased to the effect that he had made a contract with plaintiff by which plaintiff was to have the plant when the Adamses were through with it. One of these witnesses testifies that deceased had said he had made all arrangements, and, again, that it was definitely understood between deceased and Minion, and that deceased told witness he had promised plaintiff that the plant should be his when the Adamses were dead. Another witness testifies to substantially the same thing, and still a third testifies to a statement made by Adams to the effect that Minion had once left him, and that Adams told him that he got Minion back with the understanding that the property should be his when he (Adams) was through with it, and that the property was really Minion's, really Minion's plant, and that eventually it should be his. Another testified to statements by deceased as to the low wages being paid Minion, and that the reason was that, at Adams' death, plaintiff was to have the property. Several other witnesses testify to a state of facts from which it ought to be inferred, in connection with all the other evidence in the case, that there was a contract. One testifies that arrangements had been made by which the plant was to go to plaintiff when the surviving Adams died, and that arrangements had been made to this effect years ago. Another says that deceased told him that arrangements had been made to leave it all to Minion. Another testifies that deceased told him that every-

thing was fixed and everything had been fixed by which the plant was to go to Minion. Though search was made for a will, none was found, and from the evidence we should conclude that deceased did not make a will. He did talk with one of the witnesses, at one time some two years before his death, about making a will, but when he was informed how the property would pass if he made no will, he said he guessed he did not want to make a will, and did not then make one. It is shown that deceased carefully preserved all deeds, documents and papers, many of which were produced in evidence, but there was no deed to plaintiff; so that it is clear that, if any arrangement was made, or if it was all fixed that plaintiff was to have the property on the death of Adams, it had not all been fixed by a deed or will; so that, under all the evidence, it seems to us there must have been a contract such as is testified to by the different witnesses. The trial court, after having seen and heard the witnesses, and after considering the competent evidence, stated, in his opinion and finding, that he had not the slightest doubt that there was a contract between Minion and Adams.

C. W. Adams, one of the administrators, the brother of deceased, A. M. Adams, testified that he was familiar with plaintiff's history since his marriage up until the time of his brother's death, and that plaintiff was an industrious and honest young man, and that he was continuously in the printing establishment from 1882 to the present time. He testifies that, when his brother was at home, he could not say that the brother was active in the newspaper business, but he did some writing; that it was his habit, ever since witness can remember, to get through the world as easily as he could; that during the last 20 years he had not seen deceased do any of the mechanical work around the plant, though he did that when it first started. The same witness, testifying for defendant, says that, though he saw deceased

often, he never heard him say anything with reference to the disposition of the property to Minion or anyone else; and a sister of deceased's testifies to substantially the same thing, and that plaintiff said, during the last sickness of her brother, that he was not anticipating anything from the estate; that deceased told her that he had to call plaintiff down several times in order to let him know who was boss. Another witness testifies that deceased told her, a year or two before he died, that he would sell the paper to the husband of the witness. But we think this testimony ought not to be taken too seriously, because it is shown that her husband was without any means whatever, and that deceased knew that fact. Another witness for defendant testifies to negotiations in regard to remodeling the upstairs of the building, that deceased might occupy them as living rooms, because there was some talk then that Mr. Adams would marry again. This was in 1914, and the witness says plaintiff was not consulted with reference to the changes. It is thought by appellants that this testimony tends to show the inconsistency of plaintiff's claim that he was in absolute charge of the business and building. Doubtless plaintiff's claim at this point was too broad, because, under the contract as shown, he was not to have the property until the death of both the Adamses. Another witness testifies to a conversation with deceased, which was not in the presence of plaintiff, at about the time it was thought Mr. Adams would marry again. The talk was that plaintiff seemed to have a grievance, and that, because Adams was going to get married, plaintiff figured it would spoil his interest in what Adams should leave, and that Mr. Adams replied that plaintiff had no reason to expect that, that he knew of. This evidence, if competent, is a circumstance, of course, as to Adams' state of mind; and yet, if plaintiff had a valid existing contract before that time, there might have been some question raised had Adams attempted to carry out his

idea which he then had that he would marry the woman and she would continue the business, or that he would sell the property.

Without going further into the evidence, it is our conclusion that there was a contract as alleged, and that plaintiff performed his part of the contract, and that it was in all respects complete, except the vesting of the legal title in the plaintiff. This was not to be done until the death of the survivor. As to the extent of the contract and what property was included, the evidence of the witnesses in testifying to the conversations with deceased was that he sometimes referred to the property as the "plant," sometimes as the "property," sometimes as the "whole thing," sometimes as "this ranch and everything," and so on. But under all the evidence, we think the contract is sufficiently proved as to the newspaper business, the plant, and the real estate used in connection therewith. In proving a contract of this kind, if it is ever to be established in any case, the evidence is made up, very often, in large part by statements of the parties to different persons, and made up of fragments put together as a whole. In making such statements, the party making them would not be likely to use the same language to every person, nor use the same degree of accuracy that he would in drawing a legal document.

Some question is made as to where the money came from that went into the business. Under the evidence, the contract and the understanding between plaintiff and deceased were that plaintiff was to have the newspaper plant and the real estate used in connection with it as it stood when Mr. Adams died. Appellants cite a number of cases, among them *Boeck v. Milke,* 141 Iowa 713, *McDonald v. Basom,* 102 Iowa 419, 424, *Bremer v. Haag,* 151 Iowa 449, *Bevington v. Bevington,* 133 Iowa 351, *Wilson v. Wilson,* 99 Iowa 688, *Holmes v. Connable,* 111 Iowa 298, *Briles v. Goodrich,* 116 Iowa 517, *Ross v. Ross,* 148 Iowa 729, 733,

*Western Securities Co. v. Atlee,* 168 Iowa 650, *Gould v. Gunn,* 161 Iowa 155, and *Collins v. Collins,* 138 Iowa 470, to sustain their propositions that there was no intention upon the part of deceased to contract the premises claimed by the plaintiff, and that no more was intended than an unexecuted purpose to make a will; that there was no change of possession during Adams' lifetime; that the contract was within the statute of frauds, and the services rendered by plaintiff were not exclusively referable to the contract; that plaintiff never had possession during the lifetime of deceased; that a contract may not be considered as established as a matter of law simply because witnesses testify thereto and there is no denial by living witnesses; that such a contract must be mutual and definite.

Appellee contends that the evidence establishes his claim with the certainty required in this class of cases, and cites *Chehak v. Battles,* 133 Iowa 107; *Stiles v. Breed,* 151 Iowa 86; *Horner v. Maxwell,* 171 Iowa 660; *Daniels v. Butler,* 169 Iowa 65; and other cases.

Without going into a discussion of these several cases, it is our conclusion that, under the record, plaintiff is entitled to the relief granted by the district court. The judgment and decree are therefore—*Affirmed.*

Gaynor, C. J., Weaver and Stevens, JJ., concur.